UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JANE DOE

            Plaintiff

               - against -                        17 Civ. _____

ANTHONY J. ANNUCCI, Acting
Commissioner of the New York Department
of Corrections and Community Supervision;
JASON EFFMAN, Associate Commissioner
and PREA Coordinator for New York
Department of Corrections and Community        **COMPLAINT**
Supervision; SABINA KAPLAN,
Superintendent of Bedford Hills Correctional
Facility; and JEFFREY GREEN, FNU
HURT, FNU WILLIAMS, FNU MURPHY,
FNU JACKSON, FNU EDDY, Sergeant        **Jury Trial Demanded**
FNU SPIEGHTS, FNU PAIGE, FNU
GARCIA and JOHN DOEs #1-3,
Correctional Officers at the Bedford Hills
Correctional Facility, in their individual and
official capacities,

            Defendants.

-----------------------------------------------------------------X

       Plaintiff JANE DOE, by and through her attorneys, Perlmutter &

McGuinness, P.C. and the Law Office of Zachary Margulis-Ohnuma, as and for

her complaint, hereby allege as follows:

## PRELIMINARY STATEMENT

1.      One week after a putative class-action lawsuit was filed seeking to curb the sexual abuse of female prisoners in New York State, defendant Correction Officer JEFFREY GREEN ("CO GREEN") sexually assaulted a 27-year-old inmate in her cell at Bedford Hills Correctional Facility ("BHCF") in Bedford Hills, New York. CO  GREEN's victim, Plaintiff Jane Doe, brings suit under 42 U.S.C. § 1983 against GREEN, who was on duty at the time, and fourteen specific prison officials who sought to protect him.  CO GREEN's assault was the direct result of the pervasive culture of impunity for officers and retaliation against victims that exists in women's prisons in New York and was described in detail in the Complaint in *Jones v. Annucci*, Case No. ECF 16-cv-1473(RA), which was filed on March 3, 2016. Unlike in the vast majority of cases, Plaintiff is able to corroborate her allegations with DNA evidence and video surveillance, which led to GREEN's pending prosecution in Federal court.

2.      Plaintiff brings suit against Bedford Hills Correctional Officer JEFFREY GREEN as well as Bedford Hills Correctional Officers, FNU HURT, FNU WILLIAMS, FNU MURPHY, FNU HENRY, FNU JACKSON, FNU EDDY, Sergeant FNU SPIEGHTS, FNU PAIGE, FNU GARCIA, and JOHN DOEs #1-3, who attempted to bar and obstruct Plaintiff from reporting the sexual assault, violated her confidentiality, and retaliated against her verbally and physically.

3.      Plaintiff also brings suit against those with policy-making authority and responsibility for the safety and well-being of Plaintiff, who were on notice of

the substantial risk of sexual abuse faced by Plaintiff, through various reports and pending and prior litigation filed against the State of New York involving sexual abuse of female inmates by correctional officers.  In the *Jones* litigation alone, four of the six plaintiffs were sexually assaulted while incarcerated at BHCF.

4.      ANTHONY J. ANNUCCI, Acting Commissioner New York Department of Corrections and Community Supervision ("DOCCS"), and SABINA KAPLAN, Superintendent of BHCF failed to implement policies protecting Plaintiff from sexual abuse by correctional officers, including CO GREEN.  Additionally, Plaintiff was unable to safely and confidentially report the abuse to authorities, and she was subjected to multiple retaliation efforts from BHCF correctional staff.  As a result, the Defendants violated Plaintiff's rights to be free from cruel and unusual punishment and must compensate her for her physical and emotional injuries.

5.      This is a civil rights action brought under 42 U.S.C. § 1983 to vindicate rights of Plaintiff under the United States Constitution, the New York State Constitution, and the statutory and common laws of the United States and the State of New York.

## JURISDICTION

6.      Subject matter jurisdiction over the federal constitutional issues is proper in this Court pursuant to 28 U.S.C. § 1331.  Plaintiff also invokes the Court's supplemental jurisdiction under 28 U.S.C. § 1367 over any and all state law claims and causes of action, which derive from the same nucleus of operative facts and are part of the same case or controversy, that gives rise to the federal claims and causes

of action.  This Court has jurisdiction to order damages, attorneys' fees, injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred inside the Bedford Hills Correctional Facility located in the Southern District of New York.

8.

## PARTIES

9.    Plaintiff JANE DOE, is a female inmate at BHCF under the operation and control of DOCCS.

10.    Defendant ANTHONY J. ANNUCCI is the Acting Commissioner of DOCCS, which was formerly known as the New York Department of Correctional Services.  Commissioner ANNUCCI is sued herein solely in his official capacity.

11.    Defendant JASON EFFMAN was at all relevant times Associate Commissioner and Prison Rape Elimination Act (hereinafter "PREA") Coordinator for DOCCS.  The United States Department of Justice ("DOJ") regulation at 28 C.F.R. § 115.11(b) requires an agency to employ or designate an upper-level, agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with PREA standards in all its facilities.  Upon information and belief, JASON EFFMAN was at all relevant times the individual charged with these responsibilities for DOCCS.  JASON EFFMAN is sued in his official capacity.

4

12.     Defendant SABINA KAPLAN was at all relevant times the superintendent of BHCF.  Superintendent SABINA KAPLAN is sued in her official capacity.

13.     Defendant JEFFREY GREEN (hereinafter "CO GREEN") was at all relevant times a correction officer at BHCF.  On February 8th, 2017, the United States Attorney for the Southern District of New York charged CO GREEN with Deprivation of Rights Under Color of Law (18 U.S.C. § 2, 242).  *See U.S. v. Jeffrey Green,* Case No. 17-MJ-1006 (CUA).  Defendant Green was previously charged in state court.

14.     Defendants FNU HURT, FNU WILLIAMS, FNU MURPHY, FNU HENRY, FNU JACKSON, FNU EDDY, Sergeant FNU SPIEGHTS, FNU PAIGE, and FNU GARCIA were at all relevant times correctional officers at BHCF.

15.     JOHN DOEs #1-3 (hereinafter "CO JOHN DOEs #1-3") are pseudonyms for unidentified correctional officers at BHCF.

## FACTUAL ALLEGATIONS

### I.     Plaintiff's Personal Background

16.     Plaintiff is 27 years old and was born and raised in Niagara Falls, New York.

17.     On September 1, 2011, Plaintiff was arrested for her participation in a robbery, in the course of which the victim died of a heart-attack.

18.     Plaintiff plead guilty to first-degree attempted robbery. She was sentenced on February 27, 2012, to 13 years' imprisonment.

19.     Plaintiff voluntarily testified against her co-defendant, MATTHEW DAVIS.  DAVIS was sentenced to 25 years' imprisonment.

20.     At the time of her arrest, Plaintiff was attending her first semester of college at Niagara County Community College and was working as a home-health aide.

21.     While in prison, Plaintiff enrolled in educational and work programs to gain the skills necessary to succeed upon her release.

22.     Plaintiff excelled in her Alcohol and Substance Abuse Treatment ("ASAT") program and participated in two domestic violence courses.

23.     Plaintiff also enrolled in college courses in prison and is currently working towards a sociology degree from Marymount Manhattan College.

24.     While in prison, Plaintiff worked her way up from a Porter to a Nursery School Attendant, a Grade Four position, the highest level, where she cared for the infants in BHCF's nursery.

25.      Before the assault, Plaintiff had a good relationship with the correctional officers at BHCF.  She was not receiving any mental health counseling nor was she taking any medications or illegal drugs.

II.     **The Assaults and Retaliation**

    A.     **The March 10, 2016 attack on Plaintiff**

26.     On March 10, 2016 Plaintiff was an inmate at BHCF.  Plaintiff was housed in Hall C of Unit 112 C/D.

27.     CO GREEN, the defendant, was a correction officer employed by DOCCS before and up to March 10, 2016.

28.     He was working as the Second Officer on that date in Unit 112 C/D.

29.     Unit 112 is comprised of two hallways, C and D, which are joined in the middle by a glass security box, called the "Bubble".  There are 30 cells in each hallway.

30.     To enter or exit Unit 112, the officer on duty in the Bubble must use controls to open the unit door, located about five feet away from the Bubble.

31.     The cells in Unit 112 have sliding doors that are controlled remotely from the Bubble.  A correction officer can open all the doors simultaneously or a single door by turning various knobs on the control panel.

32.     The evening of March 10, 2016, CO GREEN and CO FNU HURT, were on duty in Unit 112 C/D.

33.     Upon information and belief, DOCCS regulations require that two correctional officers are on duty at all times in Unit 112.  One correction officer stays in the Bubble while the other occasionally leaves to conduct rounds.

34.     At approximately 7:00 p.m., Plaintiff and another inmate were eating food they had prepared in the unit's kitchen.

35.     CO GREEN, who, upon information and belief, had never worked in Unit 112 before that evening, began asking Plaintiff about Plaintiff's girlfriend.

36.     CO GREEN knew that Plaintiff dated women as well as men.

37.     Plaintiff told CO GREEN that her relationship with another inmate had recently ended.

38.     CO GREEN then stated, "I'm coming into your room tonight."

39.     Plaintiff then cleaned her dishes and left to take a shower.

40.     Another inmate witnessed the entire exchange set forth in the preceding five paragraphs.

41.     Plaintiff took a shower in the shower facility, which is located next to the Bubble.

42.     Plaintiff returned to her cell and dressed for bed.

43.     Plaintiff then participated in the evening's "count."

44.     The count requires all inmates to return to their cells while the correctional officers on duty count the inmates to ensure that all are present and in their cells.

45.     At approximately 10:00 p.m., shortly after the evening's count concluded, the inmates in Unit 112 were locked in their cells.  At that time, Plaintiff was also in her cell.

46.     At approximately 10:11 p.m., CO FNU HURT, the First Officer on duty, left Unit 112 C/D, leaving CO GREEN alone in the Unit.

8

47.     Shortly thereafter, CO GREEN remotely opened Plaintiff's cell door from the Bubble.

48.     CO GREEN then yelled to Plaintiff from the Bubble, which was located approximately five to ten feet away from her cell, and told Plaintiff to approach him at or around the Bubble.

49.     CO GREEN's statements and actions were recorded on audio and video surveillance recordings.

50.     Upon information and belief, CO GREEN can be heard on the audio recordings stating, "You ready [unintelligible] me my blow job?"

51.     Plaintiff did not hear CO GREEN's statement.

52.     Plaintiff approached the Bubble as instructed.

53.     Plaintiff and CO GREEN spoke for several moments before Plaintiff returned to her cell.

54.     Plaintiff's cell door remained open.

55.     Approximately two minutes later, CO GREEN entered Plaintiff's cell. CO GREEN was unaccompanied by any other correctional officers or other BHCF staff.

56.     Once inside Plaintiff's cell, CO GREEN grabbed Plaintiff by Plaintiff's arms and pushed Plaintiff against the wall.

57.     CO  GREEN then licked, kissed, and bit Plaintiff's neck.

58.     CO GREEN also grabbed and fondled Plaintiff's breasts over Plaintiff's clothing.

9

59.     Plaintiff attempted to push CO GREEN away.  CO GREEN overpowered Plaintiff, grabbed Plaintiff and forcibly pushed her into the wall.  CO GREEN then pressed his body into Plaintiff's body.

60.     CO GREEN then pulled up Plaintiff's shirt and bra exposing Plaintiff's breasts.

61.     CO GREEN kissed, licked, and bit Plaintiff's neck, chest, breasts, and nipples.

62.     CO GREEN also put his hands down Plaintiff's shorts and fondled Plaintiff's genitalia and groin.

63.     CO GREEN attempted to remove Plaintiff's shorts by pulling down on them but was unable to remove the shorts while trapping Plaintiff against the wall with his body.

64.     Throughout the assault, Plaintiff continued to try to push CO GREEN away.

65.     At one point during CO GREEN's sexual assault of Plaintiff, CO GREEN and Plaintiff heard a loud knock on the unit door, approximately ten feet away from Plaintiff's cell.

66.     A correction officer, CO JOHN DOE #1, had approached the Bubble and, seeing it empty, knocked on the unit door to gain admittance.

67.     CO GREEN exited Plaintiff's cell and rushed back to the Bubble.

68.     Once inside the Bubble, CO GREEN used the panel to remotely open the access door for CO JOHN DOE #1.

10

69.     Simultaneously, CO GREEN closed Plaintiff's cell door from the Bubble.

70.     The next morning, on March 11, 2016, Plaintiff told the Unit Officer, CO FNU WILLIAMS that she wanted to speak to the "PREA Representative."

71.     The PREA Representative is another term for the PREA Compliance Manager ("PREA CM").

72.     The PREA CM is responsible for coordinating BHCF's efforts to comply with PREA standards.

73.     At all relevant times, BHCF's PREA CM was ELAINE VELEZ.

74.     CO FNU WILLIAMS refused to allow Plaintiff to speak with the PREA CM unless Plaintiff first told CO FNU WILLIAMS what Plaintiff wanted to tell the PREA CM.

75.     Plaintiff refused to tell CO FNU WILLIAMS the details of the incident.

76.     Instead, Plaintiff went to the phones and dialed the PREA hotline at #77.

77.     Immediately after Plaintiff's phone call with the PREA hotline, Sergeant FNU SPIEGHTS asked Plaintiff what Plaintiff was doing on the phone.

78.     Plaintiff responded that Plaintiff was talking to the PREA hotline.

79.     Sergeant FNU SPIEGHTS told Plaintiff that Plaintiff must tell her about the incident before she could report it to PREA.

80.     Plaintiff refused and restated her desire to speak to the PREA CM.

11

81.     Sergeant FNU SPIEGHTS continued to insist that Plaintiff tell her the details of the incident.

82.     Frustrated, Plaintiff, looked up at the microphones dangling above them and loudly stated, "Last night, one of your officers sexually assaulted me."

83.     Sergeant FNU SPIEGHTS then ordered Plaintiff to get dressed and to come with her to her office.

84.     Upon information and belief, Sergeant FNU SPIEGHTS' office is not under video or audio surveillance.

85.     Sergeant FNU SPIEGHTS again told Plaintiff that Plaintiff must tell her the details of the incident before she would alert the PREA CM.

86.     Plaintiff again refused.

87.     Finally, Sergeant FNU SPIEGHTS requested the PREA CM, ELAINE VELEZ, to come meet Plaintiff.

88.     Plaintiff met with Sergeant F.N.U. SPIEGHTS, VELEZ, and the Deputy of Security, FNU MURPHY.

89.     While Plaintiff reported details of the assault,  Deputy of Security FNU MURPHY asked Plaintiff what Plaintiff did or said to make CO GREEN feel like CO GREEN was permitted to enter Plaintiff's cell and be sexually intimate with Plaintiff.

90.     VELEZ properly informed Deputy of Security FNU MURPHY that such a question was inappropriate.

91.    After Plaintiff reported the assault, she was transferred to Westchester County Medical Center.

92.    Upon information and belief, samples were taken from Plaintiff's neck and breasts, which yielded positive results for saliva.

93.    Upon information and belief, the saliva recovered from Plaintiff's body matched CO GREEN.

### B. Retaliation Against Plaintiff for Reporting the Assault

94.    Upon information and belief, Plaintiff's report of CO GREEN's sexual abuse did not remain confidential.

95.    Since Plaintiff reported the sexual assault by CO GREEN, the relationship between Plaintiff and the correctional officers has changed dramatically.

96.    Correctional officers assigned to security positions are now rude and aggressive towards Plaintiff.

97.    Correctional officers glare at Plaintiff when she enters a room and appear to whisper about her when she walks by them in the hallway.

98.    Plaintiff has also been subjected to several specific retaliation efforts by BHCF's correctional officers.

99.    About one to two weeks after Plaintiff reported the sexual assault to authorities, CO FNU HENRY passed Plaintiff on the sidewalk and said, "There goes the girl getting a million dollars for getting her tits licked."

100.   One day, sometime after the assault, while Plaintiff was in the lobby, CO FNU PAIGE called Plaintiff a liar who was just trying to get officers fired.

101.   A day later, Plaintiff began feeling ill during one of her programs and was sent to the lobby officer to be escorted to medical.

102.   CO FNU PAIGE was the lobby officer on duty.  CO FNU PAIGE again accused Plaintiff of being a liar and a faker, both related to her illness and to the reported assault.

103.   Correctional officers have conducted searches of Plaintiff's person and cell with increased frequency and thoroughness since Plaintiff reported the assault.

104.   No contraband has been found.

105.   Plaintiff made a formal written complaint about the frequency of searches.  Months later, after no action was taken on the written complaint, correctional staff requested that Plaintiff "sign off" on the written complaint, effectively withdrawing it.

106.   Upon information and belief, Plaintiff's "sign off" on the complaint had the effect of deleting any record of it.

107.   Plaintiff agreed to "sign off" on the complaint because no progress was being made and because the frequency of unnecessary searches had reduced in the intervening months.

108.   CO FNU GARCIA completed at least one of the unnecessary searches at unit 113, C Corridor, Cell 20 on or about July or August 2016.

14

109.    After Plaintiff complained about the searches, CO FNU GARCIA, approached Plaintiff and told her that "higher-ups" ordered the searches because they heard that Plaintiff was writing a book related to the sexual assault of Plaintiff.

### C.  The October 18, 2016 Incident

110.    On or about October 18, 2016, Plaintiff returned to her cell after taking a shower.

111.    All the cell doors were open.

112.    Plaintiff put up a privacy curtain to change from her bathrobe into her clothes.

113.    Shortly after Plaintiff removed her robe, CO FNU JACKSON, a male correction officer, without warning or entry, pushed aside Plaintiff's privacy curtain and took a step into Plaintiff's cell.

114.    DOJ regulation 28 C.F.R. § 115.15 and BHCF Directive #4001, Facility Administrative Coverage and Supervisory Rounds, 4/7/14 IV B, requires that staff of the opposite gender announce their presence when entering an inmate housing unit.

115.    BHCF's policies require that inmates be permitted to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing them.

116.    Plaintiff was completely naked when CO FNU JACKSON entered Plaintiff's cell.

15

117.    Upon information and belief, CO FNU JACKSON then looked at Plaintiff and said to Plaintiff, "Come get it."

118.    CO FNU JACKSON then left Plaintiff's cell and returned to the Bubble.

119.    Plaintiff put her robe on and immediately walked to the Bubble.

120.    Plaintiff told the other officer on duty, CO FNU EDDY, that Plaintiff wanted to speak to the Sergeant.

121.    CO FNU EDDY asked Plaintiff why she needed the Sergeant.  Plaintiff told CO FNU EDDY what CO FNU JACKSON had done.

122.    CO FNU EDDY told Plaintiff to "let it go" and that CO FNU JACKSON was just doing "rounds."

123.    Plaintiff again requested the Sergeant but CO FNU EDDY refused to notify the Sergeant for Plaintiff.

124.    Plaintiff left the unit and told another officer, CO JOHN DOE #2, about the incident.

125.    Plaintiff again requested the Sergeant.

126.    Approximately three hours after Plaintiff returned to her unit, a sergeant, CO JOHN DOE #3 contacted Plaintiff.

127.    CO JOHN DOE #3 told Plaintiff that CO FNU JACKSON was just doing rounds.

128.    Unable to get assistance from correctional officers, Plaintiff called the PREA hotline to report the incident.

16

Upon information and belief, Plaintiff has not received any updates regarding the status of her report.

### III.    Aftermath of the Assault

129.    Since the March 10, 2016 sexual assault and the subsequent retaliation efforts against Plaintiff, Plaintiff suffers from anxiety, paranoia, depression, and feelings of helplessness.

130.    Plaintiff also experiences vivid flashbacks of the assault by CO GREEN.

131.    Plaintiff became so depressed that she sought counseling from the Office of Mental Health ("OMH"), and she was put on anti-depressants.

132.    Previously, Plaintiff had repeatedly refused medication because she had a history of substance.  After the assault, the flashbacks became so overwhelming, however, that Plaintiff agreed to take medication.

### IV.    Defendants are Aware of Systematic Failures to Protect Female Inmates From Sexual Abuse by Correctional Staff

*Sections A-C below are taken from the Complaint filed in Jones v. Annucci, ECF 16-cv-1473(RA), ¶¶ 15-52, which are fully incorporated into this complaint.*

#### A.    Defendants Know that Women Prisoners are at Substantial Risk of Sexual Misconduct by DOCCS Staff

133.    Defendants are aware that prisoners are at risk of sexual abuse from prison staff.

a.  Awareness of the risk and incidence of sexual abuse in a prison setting has led the federal government, the District of Columbia, and all fifty states[1] to enact statutes criminalizing any sexual contact between prisoners and correctional staff.  *See, e.g.*, N.Y. Penal Law § 130.05(e).

b.  Awareness of the risk of custodial sexual abuse has led to the enactment of PREA.

c.  The Office of Special Investigations ("OSI") receives approximately 200 complaints of staff sexual misconduct and harassment each year.[2]

134.   For a number of reasons and from a variety of sources, Defendants are aware that assigning male staff to guard female prisoners creates obvious risks of sexual abuse.

a.  Defendants are aware that sexual abuse occurs in their women's facilities[3] and that sexual abuse of women prisoners is primarily perpetrated by male correctional staff.

---

[1] National Criminal Justice Reference Service, National Prison Rape Elimination Commission Report at 37 (June 2009), https://www.ncjrs.gov/pdffiles1/226680.pdf.

[2] U.S. Dept. of Justice, Bureau of Justice Statistics, "Survey of Sexual Violence in Adult Correctional Facilities 2009–2011," Statistical Tables at 7-11 (Jan. 2014), http://www.bjs.gov/content/pub/pdf/ssvacf0911st.pdf (in 2011, there were 184 allegations of staff sexual misconduct and 24 allegations of staff sexual harassment; in 2010, 168 allegations of staff sexual misconduct and 65 of staff sexual harassment, and in 2009, 173 allegations of staff sexual misconduct and 38 of staff sexual harassment) ("2009-2011 BJS Sexual Violence Statistics").

[3] *See* Ex. A, August 26, 2015 Letter from DOCCS (Kimberly Sesselman, Assistant Records Access Officer, response to counsel request under the NYS Freedom of Information Law ["FOIL"] detailing that 78 investigations into staff sexual abuse were opened at the women's prisons in 2012, and 61 were opened in 2013) ("Aug. 26, 2015 FOIL Response").

b.  Awareness of the risk and incidence of sexual abuse in a prison setting has led to the promulgation of international standards prohibiting the assignment of male correctional staff to guard women prisoners.  United Nations Standard Minimum Rules for the Treatment of Prisoners, Rule 53, adopted Aug. 30, 1955.

c.  Awareness of the risk and incidence of sexual abuse in a prison setting, including the particular risks facing women prisoners, has led several states and local correctional institutions to require the presence of female staff to guard women prisoners, and even to remove men from guarding women prisoners, at least in housing areas.[4]

---

[4] *See, e.g., Teamsters Local Union No. 117 v. Washington Dep't of Corrs.,* 789 F.3d 979 (9th Cir. 2015) (holding that the Washington Department of Corrections was entitled to the bona fide occupational qualification ("BFOQ") defense because it was "well justified in concluding that rampant abuse should not be an accepted part of prison life and taking steps to protect the welfare of inmates under its care."); *Tipler v. Douglas County, Nebraska*, 482 F.3d 1023 (8th Cir. 2007) (prison policy relying on Nebraska Code, § 47-111, which required supervision of female inmates in county jails by a female matron, did not violate Title VII); *Everson v. Michigan Dep't of Corrs.*, 391 F.3d 737, 748, 751 (6th Cir. 2004) (reversing trial court's decision and finding that, given the "grave problem of sexual abuse of female inmates," the Michigan Department of Corrections' ["MDOC's] plan to designate certain female-only positions on housing units did not violate the civil rights of corrections officers because sex is a "BFOQ reasonably necessary to the normal operation of [a] particular business or enterprise"); *Reed v. County of Casey*, 184 F.3d 597 (6th Cir. 1999) (upholding a gender-based transfer of a female deputy jailer where it was reasonably required to comply with Kentucky law requiring female supervision of female inmates); *Robino v. Iranon*, 145 F.3d 1109 (9th Cir. 1998) (finding that gender was a BFOQ in assigning female officers to particular posts when those posts required the officers "to observe the inmates in the showers and toilet areas…or provide[] unsupervised access to the inmates."); *Tharp v. Iowa Dep't of Corrs.*, 68 F.3d 223 (8th Cir. 1995) (finding that sex-based shift restrictions do not implicate Title VII where the "policy was adopted to meet legitimate

d.  Defendants are aware that women prisoners are a particularly

vulnerable population who face a heightened risk of sexual abuse by male

officers. As many as 80% of women prisoners have been physically or sexually

abused prior to their incarceration.[5]  A larger number of incarcerated women

have histories of sexual and physical abuse than male prisoners or women

who have never been incarcerated.[6]  These abuse histories make women

especially vulnerable to coercion and manipulation.[7]

---

penological concerns… and… plaintiffs ha[ve] many different shift assignments and
promotions available to them."); *Torres v. Wisconsin Dep't of Health and Soc.
Servs.*, 859 F.2d 1523 (7th Cir. 1988) (en banc) (reversing District Court's finding
that defendants had not established sex as a valid BFOQ in supervising female
felons under Title VII, and remanding to District Court for further consideration);
see also 9 NYCRR § 7504.1(e) ("Supervision of female prisoners shall be
accomplished by a matron, and a female prisoner shall not be placed in or removed
from a detention area unless the matron is present. The matron shall return the
key for the detention area females and no male person shall be permitted to enter
an area where female prisoners are detained unless accompanied by the matron.").

[5] 57.2 percent of females report abuse before admission to state prison versus 16.1
percent of males. 39.0 percent of female state prison inmates report that they were
sexually abused before admission to state prison versus 5.8 percent of males. U.S.
Dept. of Justice Bureau of Justice Statistics, "Prior Abuse Reported by Inmates and
Probationers" at 1 (April 1999) ("BJS Prior Abuse"), http://www.bjs.gov/content/
pub/pdf/parip.pdf; *see also* Allison Hastings, Angela Browne, Kaitlin Kall, and
Margaret diZerega, "Keeping Vulnerable Populations Safe Under PREA:
Alternative Strategies to the Use of Segregation in Prisons and Jails" at 11-13
(March 2015), http://www.vera.org/pubs/housingvulnerable-populations-prea-guide
("[W]omen in the criminal justice system report more extensive victimization
histories – of sexual and physical abuse – than women who have not been
incarcerated or men who have been incarcerated. In one study of women in …
maximum security prison, more than half (59%) of women in the study reported
childhood sexual molestation, and 77 percent reported lifetime physical or sexual
assaults by non-intimates.").

[6] BJS Prior Abuse, *supra*, note 7, at 1-2 (over one-third of female state prisoners and
jail prisoners reported being abused as children, compared to estimates from 12-

135.    In addition to awareness based on the ample information regarding the problem of staff sexual abuse in correctional settings generally, Defendants are aware of the substantial risk to women prisoners of sexual misconduct by male staff in New York facilities given DOCCS' own actual experience, particularly because DOCCS knows that sexual abuse is significantly under-reported in the prison context.[8]

a.   In 2012, 78 investigations were opened by the Sex Crimes Unit ("SCU") into sexual misconduct involving DOCCS staff at the all-women's

---

17% of females in the general population.); Browne, A., Miller, B., & Maguin, E., Prevalence and Severity of Lifetime Physical and Sexual Victimization Among Incarcerated Women, International Journal of Law and Psychiatry 22 at 301-322 (1999) (finding higher rate of abuse history than BJS data, with 70% of incarcerated women interviewed in a New York maximum security prison reporting physical violence and nearly 60% reporting sexual abuse).

[7] See Cindy Rich, Amy Combs-Lane, Heidi Resnick & Dean Kilpatrick, Child Sexual Abuse and Adult Sexual Revictimization, From Child Sexual Abuse to Adult Sexual Risk: Trauma, Revictimization, and Intervention (2004).  A 2013 report from the DOJ's Bureau of Justice Statistics states that "[i]nmates who experienced sexual victimization before coming to the facility were also more likely than inmates with no sexual victimization history to report incidents of sexual victimization involving other inmates and staff."  U.S. Dept. of Justice, Bureau of Justice Statistics, "Sexual Victimization in Prisons and Jails Reported by Inmates 2011-12" at 19 (May 2013) ("2011-2012 BJS Statistics"), www.bjs.gov/content/pub/pdf/ svpjri1112.pdf; Messman-Moore, T.L. & Long, P.J., "Child Sexual Abuse and Revictimization in the Form of Adult Sexual Abuse, Adult Physical Abuse, and Adult Psychological Maltreatment," J. Interpers. Violence 15 (5) at 489-502 (May 2000) (women with childhood sexual abuse history were more likely to experience adult sexual violence, physical violence and psychological maltreatment as adults, and were more vulnerable to verbal coercion or pressure from individuals in authority).

[8] United States Dep't of Justice, "Regulatory Impact Assessment for PREA Final Rule" at 17-18 (May 17, 2012), http://www.ojp.usdoj.gov/programs/pdfs/prea_ria.pdf ("DOJ Regulatory Impact Assessment").

21

prisons, which currently include Albion, BHCF, and Taconic.[9]  In 2013, 61 such investigations were opened.[10]

b.  Women prisoners, although a small segment of the total DOCCS inmate population, represent a disproportionately high percentage of victims of staff-on-inmate sexual abuse in Defendants' prisons.[11]

c.  A disproportionate number of the more than 200 complaints of sexual abuse and harassment that OSI receives each year arise from the women prisons.[12]

d.  As recently as 2014 and 2015, male correctional staff from DOCCS women prisons have been criminally charged or convicted of crimes of sexual misconduct, including, most recently, several correction officers from BHCF. DOCCS received complaints of sexual misconduct about some of these officers

---

[9] Two women's prisons, Beacon and Bayview Correctional Facilities, were closed in 2013.

[10] Ex. A, Aug. 26, 2015 FOIL Response, *supra*, note 5.

[11] 95.6% of the 53,565 prisoners in custody as of January 1, 2014 were male, and only 4.4% were female. *See* DOCCS, "Under Custody Report: Profile of Under Custody Population as of January 1, 2014," at 17, http://www.doccs.ny.gov/Research /Reports/2014/Under Custody_Report_2014.pdf. However, there were 84 allegations of abuse from the women prisons in 2012 and 68 in 2013, compared with overall complaints by all prisoners of sexual abuse by staff of 211 allegations in 2009, 233 in 2010 and 208 in 2011.  *See* Ex. A, Aug. 26, 2015 FOIL Response, *supra*, note 5 (78 allegations of sexual misconduct in women prisons during 2012; 61 allegations during 2013).

[12] *See id.*; *see* 2009-2011 BJS Sexual Violence Statistics, *supra*, note 4.

22

prior to the incidents leading to their arrest, and yet failed to increase supervision over these officers.

    e.  Women prisoners have been impregnated by male staff in DOCCS prisons.[13]

    f.  The DOJ's Bureau of Justice Statistics periodically releases reports of anonymous surveys on sexual victimization in prisons and jails. The last time that women prisoners in New York were included in the survey, New York State prisoners self-reported the highest rates of staff sexual abuse in the nation.[14]

    g.  Defendants have been party to a number of injunctive and damages cases brought in both state and federal courts by women prisoners who have been victims of staff sexual abuse. The cases include the putative class action litigation *Amador v. Andrews*, which was brought on behalf of 17 named plaintiffs in 2003. *See* Case No. 03 Civ. 0650 (S.D.N.Y. 2003). In the decade-plus during which that case was pending, there were several motions to amend the Complaint to add new named plaintiffs and identify policy failures to reflect the ongoing sexual abuse problem within DOCCS.

---

[13] Alysia Santo, <u>Raped Behind Bars</u>, Albany Times Union, Sept. 9, 2013, available at www.timesunion.com/local/article/raped-behind-bars-4795883.php#page-1 ("Prison officials say there have been seven pregnancies since 2000 in which the father of the inmate's child was a staff member from the facility").

[14] Beck, Harrison, Berzofsky, Caspar, & Krebs, U.S. Dep't of Just., Bureau of Just. Stat., "Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09" at 9 (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf.

23

h.  The New York State Court of Claims has similarly seen several cases in which a woman inmate has brought claims against the State for abuse by an officer with prior complaints of sexual abuse.  *See*, *e.g.*, *Patterson v. State of New York*, 44 Misc. 3d 1230(A) (Ct. Cl. Aug. 29, 2014) (granting the claimant's motion for summary judgment and finding State liable when an officer sexually assaulted her following repeated complaints of sexual abuse by other prisoners); *Anna O. v. State*, No. 114085, M-80202 (N.Y. Ct. Cl. Aug. 15, 2012) (finding state liable when "Defendant had notice of [Officer's] propensity to pursue unauthorized relationships with inmates and yet left him in the position to continue to pursue the same, which was the proximate cause of the later rape of Claimant by [Officer]"); *Morris v. State*, Cl. No. 100694-A, M-80583 (N.Y. Ct. Cl. Mar. 6, 2012) (finding state liable when Officer had multiple previous unsubstantiated allegations of sexual assault against him, and was permitted to continue supervising inmates, in some cases as a roundsman under "diminished supervision").

136.   Defendants know that cases that result in criminal prosecutions or the discipline of staff do not reflect the entire universe of staff misconduct, given that Defendants only investigate incidents of sexual misconduct, harassment, and abuse that have been reported, and Defendants know that staff sexual abuse is significantly underreported.[15]

---

[15] *See* DOJ Regulatory Impact Assessment, *supra*, note 10, at 17-18 (concluding that, based upon the 2008-2009 BJS survey, between 69-82% percent of inmates who reported sexual abuse in response to the survey had never

a.  Victims of sexual abuse, generally, are unlikely to come forward with complaints of sexual misconduct due to embarrassment and humiliation and a fear that such complaints will be greeted with skepticism or disbelief.

b.  These concerns are exacerbated in a correctional setting, where the persons to whom such complaints are to be made are colleagues of the perpetrator(s) of the abuse, putting the victim at risk of retaliation; where complaints of such abuse are not maintained in a confidential fashion; and where there is a well-founded belief by women prisoners that such complaints will be greeted with skepticism and will not result in any action against the perpetrator.

c.  Women prisoners who were subjected to physical or sexual abuse prior to their incarceration, particularly those who complained to no avail, may face additional psychological and emotional obstacles to complaining of sexual misconduct while in prison.  These women are unlikely to come forward with such complaints while in prison.[16]

d.  Women prisoners are justified in believing that their reports will be disbelieved: of the allegations of staff sexual misconduct that are reported, DOCCS substantiates only a small percentage, a percentage that continues to fall.[17]

---

reported an incident to corrections staff).

[16] *See generally*, *id.*

[17] 2009-2011 BJS Sexual Violence Statistics, *supra*, note 4, at 7-11. *See also* Ex. B, Dec. 2, 2015 Letter from DOCCS (Deputy Counsel Nancy Heywood) response to

137.   Defendants' failure to implement and enforce policies and practices that would actually prevent and punish all sexual abuse contributes to a lenient and permissive prison culture and increases the risk of sexual abuse of women prisoners.

a.   Some of the abuse that takes place in prisons is deemed by staff to be "consensual."  In other words, the inmates are not necessarily subjected to physically forcible abuse, but rather appear to enter into sexual contact voluntarily.  However, any purportedly "consensual" sexual activity between correctional staff and the prisoners they are paid to guard and control is a fallacy, regardless of the "willingness" of the prisoner.  Consent in such circumstances is non-existent under the law, as nearly every state legislature in the United States has recognized.[18]

b.   Purportedly "consensual" sexual activity between inmates and officers does not resemble actual "consent" as it might exist outside of the prison context.

c.   Instead, the coercive nature of the relationship between officers and prisoners is well-recognized.  There is a clear power differential, with officers

---

clarification and appeal under the NYS Freedom of Information Law (detailing that of 78 investigations opened at the four female facilities in 2012, four involving male staff were substantiated, and, in 2013, of the 61 investigations opened, two involving male staff were substantiated).

[18] *See* Margaret Penland, <u>A Constitutional Paradox: Prisoner "Consent" to Sexual Abuse in Prison under the Eighth Amendment</u>, 33 Law and Inequality 507, 508 (2015).

having complete discretion over the treatment of the prisoner under his supervision, including the ability to discipline a prisoner should she disobey an order.  As previously stated, the recognition of this dynamic is reflected in the criminal laws of almost every state, criminalizing sexual acts by correctional officers with prisoners and barring the assertion of "consent" as a defense.[19]

d.  Frequently, staff increase the level of coercion and manipulation by providing prisoners with contraband such as money, personal care items, food, or even drugs and alcohol.  Staff members frequently talk with prisoners about their personal lives and then use the information about their families or about their histories with drug and alcohol abuse for further coercion.[20]

e.  There is often evidence of physical force during the sexual acts themselves.  These acts of aggression and violence intimidate the women victims and make them fearful of how the staff person may harm them should they reject any future advances or requests.

---

[19] *See* Project on Addressing Prison Rape, "Fifty-State Survey of Criminal Laws Prohibiting Sexual Abuse of Individuals on Custody" (Sept 10. 2013), https://www.wcl.american.edu/endsilence/documents/50StateSurveySSMLAWS2013Update.pdf.

[20] D.O.J., National Institute of Corrections, "Research, Practice and Guiding Principles for Women Offenders, Gender Responsive Strategies," at 5 (June 2003), www.nicic.gov/library/files/018017.pdf ("Women's substance abuse has been shown to be highly correlated with physical and sexual abuse.  Women in state prisons who had experienced abuse prior to their arrests reported higher levels of alcohol and drug abuse").

f.  And finally, once an officer has convinced a prisoner to "go along" with sexual activity, it is increasingly difficult for the prisoner to extricate herself from the "relationship" for fear of retaliation by the officer or his colleagues.

### B. Defendants Fail to Enact Supervisory Policies that Would Prevent Sexual Abuse by Male Staff and Fail to Enforce Existing Policies

138.  Despite known risks and incidents of sexual misconduct by staff, Defendants, through their policies and practices (or lack thereof) have recklessly disregarded these risks, and have failed to protect the women prisoners in their custody from harm.

139.  Defendants inadequately supervise correctional staff, placing women prisoners at a heightened risk of sexual abuse.

140.  Defendants have failed to enact appropriate rules and policies concerning the behavior of male staff and fail to enforce existing rules and policies governing staff behavior.

141.  Despite knowledge of the risk of sexual abuse in women's prisons, Defendants assign male staff to posts on which they have ample opportunity for unmonitored contact with women prisoners.

a.  Defendants have designated very few assignments within DOCCS' women's prisons as female-only posts,[21] and Defendants supervise male staff

---

[21] *See* Ex. C, DOCCS Directive 2230, "Guidelines for Assignment of Male and Female Officers" at § II.A-D.

guarding female prisoners no differently from the way they would supervise same-gender supervision of men.

b.   Male staff may be assigned, alone, to areas where no other staff are within range for visual contact.  This includes assignments that cover remote or isolated areas not monitored by video surveillance and even overnight shifts in housing areas.

c.   Defendants allow male correctional staff to bid for (to choose) their own assignments, without regard to the number or severity of allegations of sexual misconduct that have been made by women prisoners about them.

142.   Defendants have failed to enact adequate rules and policies to monitor and discipline staff engaged in behavior that constitutes warning signs of sexual abuse, such as spending a disproportionate amount of time talking to a particular prisoner, repeatedly requesting a particular prisoner for a particular assignment, discussing their personal life with a prisoner, or asking a prisoner personal questions.  Staff are not disciplined or informally counselled when supervisors witness behavior that is indicative of warning signs of sexual abuse.

143.   Defendants have failed to enact adequate rules and policies to protect women prisoners from sexual innuendoes, degrading sexual comments, and propositioning, and to enforce those rules and policies that do exist.

144.   Defendants have failed to enact appropriate rules and policies concerning the behavior of male staff posted to housing units in order to protect the privacy of women prisoners and to protect them from harassment.  Defendants also

29

fail to enforce those rules and policies that do exist.  For example, DOCCS policy requires male staff to announce their presence only the first time that they enter a living area,[22] allowing male officers to re-enter living quarters and bathroom areas unannounced, and to watch women dress and undress.  Male staff are not disciplined or reprimanded for such conduct.

145.   Defendants have failed to take sufficient action when officers leave their assigned posts, allow inmates into areas where inmates are not permitted, ask women to volunteer or work on jobs to which they have not been formally assigned, and engage in open and obvious behavior that is clearly suggestive of inappropriate relationships.

146.   Defendants permit officers virtually unfettered access to private, unmonitored areas such as bathrooms, kitchen store rooms, storage closets, slop sink areas, basements, classrooms, laundry areas, and private areas of prison yards. At the same time, Defendants fail to prohibit officers from being alone with women prisoners in such areas where sexual abuse of women prisoners is easily accomplished.  When instances of staff sexual misconduct have been substantiated, they are often found to have occurred in these isolated, and largely unmonitored, areas.

147.   Defendants fail to require and conduct reasonable searches of correctional staff upon entry to correctional facilities that could help prevent or discourage sexual abuse or ultimately assist in the investigation of allegations of

---

[22] *See id.* at § II.E.

staff sexual misconduct.  The failure to catch correctional staff with contraband such as drugs and alcohol, or to limit entry of condoms, cell phones, notes, and other personal items allows officers the opportunity to use these items to influence, coerce, or otherwise manipulate prisoners into performing sexual acts and limits the evidence that could be used in investigations of staff sexual misconduct.

148.   Defendants fail to increase the supervision of those correctional officers known to pose a heightened risk of sexual abuse to women prisoners.

a.   Defendants have failed to promulgate policies that would provide for additional rounds to more closely supervise staff about whom complaints of sexual abuse have been made.

b.   Staff who are the subject of credible or repeated allegations of sexual abuse are allowed to continue their usual posts and permitted to access private, unmonitored areas.  They can even be permitted to continue to guard or to have contact or proximity with the prisoner who has complained about the officer.

149.   To the extent Defendants have installed or required installation of surveillance cameras, use of those cameras for supervision remains grossly inadequate to protect women prisoners.

a.   Surveillance cameras have not been installed throughout the women's prisons.  Many enclosed and isolated areas inside the prison, or isolated areas outside the prison, where sexual abuse is more likely to occur, or has been reported to have occurred, are completely outside of any video or audio

31

surveillance.  These areas include storage closets, laundry rooms, slop sink areas, sheds, outside work areas, and basements.

b.  For areas for which there are privacy concerns, like bathrooms, living areas, and religious program areas, Defendants have failed to reduce the use of these areas for sexual abuse by installing video surveillance that would show entry and exit from these areas or movement within them, such as staff lingering by beds in dorm areas.

c.  Upon information and belief, camera placement is not informed or increased upon receipt of multiple credible complaints of or other knowledge of abuse occurring in particular areas or by particular staff assigned to a particular area.

150.   Staff are left alone and virtually unmonitored by supervisors for hours at a time, with staff supervision consisting almost entirely of supervisory "rounds."

151.   Defendants fail to enact and enforce adequate rules and policies that dictate the content and substance of limited supervisory rounds.

a.  Facility supervisory rounds can consist of merely stopping by the assigned line officers' desk or office, signing the logbook and nothing more.

b.  There is no requirement that supervisory staff must see each officer on duty, check in verbally with each officer, ask the officers any particular questions, speak with the prisoners on a housing unit or program assignment, or ask them if they have problems, or that they observe the

entire area, the prisoners and the staff, for any misconduct, or make any notations on what they observe.

   c.   On information and belief, supervision does not include observation and counselling or discipline for officers engaged in behavior evincing warning signs of sexual abuse, including engaging in personal conversations with inmates, sharing personal items with inmates, or repeatedly requesting a particular inmate for special assignments in secluded locations.

152.   Defendants fail to require a set number and frequency of supervisory rounds by most supervisory officers.  Only rounds by the Superintendent and her executive team are required at a specified frequency, and that is only once a week,[23] with no other written policies and procedures directing the frequency and regularity of rounds.  In practice, sergeants typically visit each post once or twice per shift.

153.   Defendants fail to require unpredictable supervisory rounds.  Facility supervisors routinely conduct rounds in a predictable manner, failing to vary their time, frequency, and point of entry, leaving staff able to predict periods of time, such as the time around shift change or after a supervisor has passed through, when they can virtually be assured that they can engage in sexual misconduct with women prisoners without being discovered.

154.   In addition, Defendants fail to enforce existing policies concerning unannounced supervisory rounds.  Therefore, even where line officers might be unable to predict a time frame without rounds, they nonetheless receive a warning

---

[23] Ex. D, DOCCS Directive 4001 "Facility Administrative Coverage and Supervisory Rounds", § VI.

of imminent rounds from their co-workers.  In some cases, supervisory staff actually inform officers of their next destination while conducting rounds, and officers use that information to alert the officers at the supervisor's next destination that the supervisor will soon be approaching.  Although nominally a new policy limiting such conduct has been promulgated, officers continue to call, radio, or use other ways to alert staff, such as tapping on their walkie-talkies in order to indicate that a supervisor is approaching.  On information and belief, Defendants fail to take steps to enforce this policy, making no effort to assess whether it is being followed, and fail to discipline staff for insubordination if they observe or otherwise find that staff have ignored or violated this policy.

### C.   Defendants Maintain Grossly Inadequate Policies and Practices for Investigating and Taking Action in Response to Complaints of Sexual Assault

155.   Defendants' system for the reporting, investigation, and response to complaints of sexual misconduct is grossly inadequate to prevent and remedy ongoing sexual misconduct.  The current system, which relies almost completely upon women prisoners to come forward and report the misconduct, fails to utilize reasonable and available investigative tools, fails to credit allegations of sexual misconduct unless the woman has physical proof or other substantial corroboration of the misconduct, is biased, deters women prisoners from reporting sexual misconduct, and fails to take appropriate action against perpetrators if and when women do come forward.  The effect of this system is to allow sexual misconduct by staff to continue virtually unabated.

34

i.   **Defendants Fail to Take Affirmative Steps to Investigate Staff Sexual Misconduct Despite Knowledge That Sexual Abuse Is Under-Reported, Thus Placing Women Prisoners at an Increased Risk of Abuse.**

156.   Defendants know that, given the reluctance of victims of staff sexual abuse to come forward, having an investigative and discipline system that relies primarily on women prisoners to volunteer complaints is insufficient to prevent and remedy this misconduct.  Nonetheless, Defendants rely on such a system and fail to utilize other means to root out sexual misconduct.

157.   Women prisoners, particularly those who receive favors from officers such as contraband, are unlikely to report abuse because they understand they may be subject to punishment and are therefore chilled and deterred from reporting, thereby perpetuating staff misconduct.

a.   Women understand that they may be charged with disciplinary offenses such as possession of contraband, being out of place, or inappropriate conduct with an officer.  Women also understand that they may be charged with making false statements if DOCCS does not believe their complaints were made in good faith.

b.   Women who make such complaints are often transferred to different prisons, while the perpetrator is permitted to continue working in the same facility.  These transfers may disrupt women's contact with their children and family, and participation in program and job assignments.  Because disciplinary history, placement in administrative segregation, and program

35

and job assignments are considered by the merit board and the parole board, a woman who complains about sexual misconduct also risks lengthening her incarceration.

158.   Despite the low likelihood of receiving reports from women prisoners about abuse by staff, Defendants rarely employ obvious measures to reduce the risk of sexual misconduct between staff and women prisoners and to prevent misconduct from occurring, escalating, or continuing.  These include measures such as heightened monitoring of situations where there have been warning signs of sexual misconduct or inappropriate relationships; searches of correctional staff; use of lie detectors; real-time review of video camera feeds; periodic review of camera footage; use of electronic recording devices; exit interviews of prisoners upon transfer and release; random interviews of staff and prisoners; and frequent, varied, and unannounced rounds by supervisory officials.

159.   When an area is under camera surveillance, Defendants fail to adequately use that surveillance footage to prevent or detect sexual abuse.

a.   Upon information and belief, camera footage is only reviewed after there has been an allegation of sexual abuse occurring in or around an area where video cameras are installed.  No real time or live-action review is conducted that might reveal misconduct or suspicious behavior.  Nor is there periodic review of footage recorded earlier in time.

b.   Defendants do not maintain camera footage for a sufficient amount of time considering the frequent delays in reporting.  Defendant's maintenance

36

of camera footage is especially lacking when considered in light of how

heavily Defendants rely on video footage for substantiating allegations.

Digital video is maintained for only a matter of days, not the time needed in a

sexual abuse investigation, given the widespread knowledge of victims'

reluctance to come forward.

### ii.   Defendants' System for Investigating Complaints of Staff Sexual Misconduct is Inadequate and Places Women Prisoners at an Increased Risk of Abuse.

160.   Defendants' treatment of women prisoners' complaints of sexual

misconduct by staff essentially dooms those complaints to failure.  An allegation of

sexual misconduct based exclusively or primarily on the statement of a woman

prisoner will not be substantiated, and will not result in any action being taken

against the staff person, even if credible and even if supported by witnesses.

161.   Defendants require an unreasonable burden of proof before

substantiating an allegation of staff sexual misconduct and taking administrative or

disciplinary action with respect to male staff.

a.   Investigators do not apply any consistent standard in determining

whether to substantiate an allegation of staff sexual misconduct and refer it

for administrative action.[24]  Typically, for an allegation of sexual misconduct

---

[24] Ex. E, Excerpts from Testimony of Sex Crime Unit Investigator Frank Annarino at 122 -124, July 17, 2012 (rough transcript), *McDonald v. Gilbert*, Cae No. 6:10-cv-06702 (JWF), (W.D.N.Y. 2012) (Annarino could not confirm that burden of proof was not beyond a reasonable doubt, and testified that burden of proof "depends on the case" as "each case is different").

or abuse to be substantiated, there must be either physical evidence or video surveillance.

b.  Defendants' investigations to determine if an allegation of staff sexual abuse should be substantiated do not give adequate, if any, weight to indicia of sexual misconduct in the absence of physical evidence.  Such indicia include staff persons being seen out of place; staff persons allowing inmates into areas where inmates are not permitted; staff persons engaging in behavior suggestive of an inappropriate relationship; and staff giving contradictory statements to investigators.

c.  Upon information and belief, Defendants' investigations fail to give adequate weight to similar prior complaints of sexual misconduct against the same staff member.  Such patterns may include allegations that a staff member has used the same language in propositioning more than one woman prisoner; allegations that an officer has taken more than one woman prisoner to the same location to engage in sexual abuse, or allegations that an officer has avoided having witnesses to the misconduct by engaging in the abuse during the count, when other inmates are locked into their cells and therefore unable to observe it.

d.  Defendants' investigations fail to give adequate weight to the credibility of witnesses.  They do not credit the statements of prisoner witnesses, while giving undue weight to statements of staff.

162.   Defendants' investigations are not thoroughly or timely conducted and often result in biased and unreliable refusals to substantiate women prisoners' complaints.

a.   Upon receiving a report of sexual abuse, Defendants fail to protect women prisoners who complain of experiencing sexual misconduct by staff from retaliation or intimidation.

b.   During the investigation of a complaint, an alleged perpetrator of sexual misconduct can remain in the same prison and can even continue to be posted in areas where he will be in contact with or responsible for guarding the victim of the misconduct.

c.   The fear of retaliation by the officer or his colleagues can discourage women prisoners (both victims and witnesses) from cooperating with investigators when sexual abuse has been reported.

d.   Defendants do not always complete investigations into claims of sexual harassment and abuse in a prompt manner, potentially subjecting both the woman who has complained and other women prisoners to continued abuse for weeks or months until an investigation is complete, and subjecting the victim to continued uncertainty.

e.   Because Defendants do not maintain camera footage for a sufficient amount of time, any delays in investigation increase the already significant possibility that potentially corroborating camera footage will no longer be available.

163.    Investigations are not often conducted in a thorough, professional, and unbiased manner.  Instead, investigators' methods are often hostile, use inappropriate language, reveal confidential information about prisoners and investigations to other prisoners, and ultimately result in deterring complete and truthful statements from those they interview or chilling prisoner participation completely.

a.  The OSI, which investigates allegations of staff sexual abuse, is part of DOCCS.  It is not an independent agency.

b.  Most investigators are former corrections officers, and some are staffed to investigate the same facilities where they formerly worked as corrections officers (and, therefore, their former colleagues).  Many investigators eventually return to work as corrections officers.

c.  The standard of proof required to substantiate an allegation of staff sexual abuse is not consistent across cases.[25]

d.  Investigators may either fail to obtain, or unreasonably delay obtaining, physical evidence even when such evidence could be probative.  For example, locations or materials potentially containing DNA that would be corroborative of the complaint have at times not been timely collected.

e.  Information provided to OSI investigators is also not kept confidential, even when staff promise confidentiality.  Prisoners interviewed as potential witnesses are frequently told the identity of the prisoner and staff person

_____

[25] *See* Ex. E, *id.* at 122:20-123:4.

40

being investigated, who made the initial allegation, and what other prisoners have said to the investigator.

     f.  Because staff do not conduct investigations into complaints of sexual misconduct in a confidential manner, the perpetrators of misconduct or their colleagues can easily learn of the investigation and inflict harassment or retaliation upon women prisoners.

164.   As a result of Defendants' policies and/or practices, staff against whom credible complaints of sexual misconduct have been lodged are not moved away from contact with women prisoners; rather, they are left in a position where they can continue to engage in sexual misconduct or retaliation virtually without fear of repercussions so long as no physical evidence or video footage of the abuse can be discovered.

165.   DOCCS policies and procedures unreasonably fail to prevent retaliation by other staff when women prisoners lodge credible complaints about sexual abuse.  Even when separated from their abusers, women frequently experience retaliation and verbal abuse from friends and colleagues of their abuser.

         iii.    **Defendant's System for Disciplining Staff is Inadequate and Places Women Prisoners at an Increased Risk of Abuse**

166.   Upon information and belief, Defendants fail to seek disciplinary action against staff in the absence of physical or video evidence, even when they have received a credible complaint of staff sexual misconduct or even multiple complaints against the same officer.

a.   Upon information and belief, even when there is substantial corroboration of a complaint of staff sexual misconduct and even when investigative staff have substantiated an allegation, Defendants do not always seek disciplinary sanctions.

b.   In the absence of video corroboration or physical evidence of the misconduct, such as semen or proof of pregnancy, even credible allegations of abuse will result in no action being taken against the staff member.

c.   Even where discipline is sought, it is limited to events that are corroborated by officer testimony, video, or other physical evidence.

d.   As a result, sanctions for engaging in sexual misconduct do not effectively function as a deterrent.  Instead, perpetrators simply use unmonitored areas of the prison to engage in acts of sexual abuse that do not result in physical proof.

167.   Upon information and belief, disciplinary staff is undertrained, including those who appear before arbitrators.  They have no legal training and no training in the prosecution of sexual abuse cases.

168.   Discipline of staff is sought only when there is physical or video evidence to corroborate an inmate's complaint.  Even in situations where there is substantial proof of misconduct, including physical proof, officers are often permitted to agree to placement at a men's prison or in the most serious cases, resign from employment and maintain their pensions.

42

169.    Even in situations where there is substantial proof of misconduct, including physical proof, if an officer does not voluntarily leave or disciplinary action is not imposed by an outside arbitrator (or even if it is imposed, upon returning to work), then the officer is permitted to return to his bid post without any increased supervision, even when investigative staff have substantiated the allegation and even when probable cause has been found that criminal activity occurred.

### iv.   Defendants' Failure to Review and Assess Policies and Procedures Places Women Prisoners at an Increased Risk of Abuse.

170.    Defendants have structured their system for addressing allegations of staff sexual misconduct so that there is virtually no assessment of whether any of Defendants' policies or procedures may have allowed the misconduct to take place. For example, investigative staff do not consider it part of their function to determine whether policies or procedures have enabled the sexual misconduct to take place or have allowed it to continue—for example—failing to regulate one male staff person being alone in enclosed areas with a female prisoner, allowing staff to pick certain prisoners for programs or work crews under their supervision, or allowing staff to ignore warning signs like prolonged conversations with a prisoner or obvious misconduct on the part of other officers.

## FIRST CAUSE OF ACTION

### CRUEL AND UNUSUAL PUNISHMENT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (CO GREEN)

171.    Paragraphs 1-171 are hereby incorporated and realleged.

172.    In kissing, biting, and licking Plaintiffs' breasts, neck, and nipples and by fondling Plaintiff's genitalia and groin, CO GREEN acted willfully and wantonly for his own sexual gratification.

173.    There was no penological justification for CO GREEN's conduct.

174.    CO GREEN's conduct was unreasonable and in violation of Plaintiffs' clearly established constitutional right to be free from cruel and unusual punishment.

175.    CO GREEN's conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

## SECOND CAUSE OF ACTION

### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (COMMISSIONER ANNUCCI, PREA COORDINATOR EFFMAN,
### SUPERINTENDENT KAPLAN)

176.    Paragraphs 1 – 171 are hereby incorporated and re-alleged.

177.    Acting Commissioner ANNUCCI, PREA Coordinator EFFMAN, and Superintendent KAPLAN, were aware that male correctional officers at BHCF were repeatedly accused of sexually abusing female inmates.

44

178.   Upon information and belief, Acting Commission ANNUCCI, PREA Coordinator EFFMAN, and Superintendent KAPLAN, failed to implement policies sufficient to protect inmates from sexual abuse by correctional officers.

179.   Acting Commissioner ANNUCCI, PREA Coordinator EFFMAN, and Superintendent KAPLAN, were deliberately indifferent to a serious risk to the safety of all female inmates at the hands of male correctional officers at BHCF.

### THIRD CAUSE OF ACTION

### DELIBERATE INDIFFERENCE
### VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (CO FNU HURT AND CO JOHN DOE #1)

180.   Paragraphs 1 – 171 are hereby incorporated and re-alleged.

181.   At all relevant times, CO FNU HURT and JOHN DOE #1 were employed as correctional officers at BHCF.

182.   CO FNU HURT acted against protocol by leaving CO GREEN alone in Unit 112, an all-female unit.

183.   CO JOHN DOE #1 failed to report CO GREEN's absence from the Bubble, a station CO GREEN was not supposed to leave without another officer present.

184.   CO FNU HURT and CO JOHN DOE #1 failed to act on, and were deliberately indifferent to, information indicating unconstitutional acts might be occurring.

## FOURTH CAUSE OF ACTION

### NEW YORK COMMON LAW ASSAULT
### (CO GREEN)

185.     Paragraphs 1-171 are hereby incorporated and realleged.

186.     On March 10, 2016, without justification or provocation, CO GREEN licked, kissed, and bit the neck and nipples of Plaintiff and fondled her genitalia at BHCF.

187.     The acts and conduct of CO GREEN were the direct and proximate cause of injuries and damages to Plaintiff and violated Plaintiff's statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

188.     CO GREEN's sexual assault on Plaintiff constituted an assault upon Plaintiff in that CO GREEN attempted to injure Plaintiff or commit battery upon her, and further that CO GREEN's acts represented a grievous affront to Plaintiff.

189.     CO GREEN's actions were intentional, reckless, and unwarranted, and without any just cause or provocation, and Defendant knew, or should have known, that his actions were without the consent of Plaintiff.

190.     Such touching caused ongoing humiliation and emotional pain.

## FIFTH CAUSE OF ACTION

### NEW YORK COMMON LAW BATTERY
### (CO GREEN)

191.    Paragraphs 1-171 are hereby incorporated and realleged.

192.    The March 10, 2016 sexual assault by CO GREEN of Plaintiff constituted a battery upon Plaintiff in that the above-described bodily contact was intentional, unauthorized, and grossly offensive in nature.

193.    Such contacts caused serious physical, psychological, and emotional pain and suffering, and otherwise caused damage to Plaintiff for which Defendant is liable.

## FIFTH CAUSE OF ACTION

### VIOLATION OF N.Y. PENAL LAW § 130.52
### FORCIBLE TOUCHING
### (CO GREEN)

194.    Paragraphs 1-171 are hereby incorporated and realleged.

195.    On March 10, CO GREEN forcibly licked and bit the breasts of and fondled the genitalia of Plaintiff for the purpose of gratifying CO GREEN's sexual desire.

196.    Plaintiff did not consent to such touching.

197.    Such touching was unlawful.

198.    Such touching violated N. Y. Penal Law § 130.52.

199.    Plaintiff suffered physical and emotional pain and other damages as a result of such touching.

## SIXTH CAUSE OF ACTION

## VIOLATION OF N.Y. PENAL LAW § 130.55,
## SEXUAL ABUSE IN THE FIRST DEGREE
## (CO GREEN)

200.    Paragraphs 1 – 171 are hereby incorporated and realleged.

201.    On March 10, 2016, CO GREEN subjected Plaintiff to sexual assault by entering her cell, pushing her against the wall, and forcibly licking and biting her breasts and fondling her genitals.

202.    CO GREEN licked Plaintiff's breasts and fondled Plaintiff's genitals for the purpose of gratifying his own sexual desire.

203.    CO GREEN touched Plaintiff's breasts and genitals through the use of physical force.

204.    CO GREEN pushed Plaintiff against a wall and trapped her there by pressing his body against hers while he ran tongue and hands over her breasts and genitals, and bit her neck and breasts with his teeth, thus placing Plaintiff in fear of immediate injury or death.

205.    Such touching violated N.Y. Penal Law § 130.55.

206.    Plaintiff suffered physical and emotional pain and other damages as a result of the violation of the N.Y. Penal Law.

## SEVENTH CAUSE OF ACTION

### RETALIATION
### VIOLATION OF U.S. CONSTITUTION AMENDMENT I
### (CO FNU HENRY, CO FNU. JACKSON, CO FNU PAIGE, and
### CO FNU. GARCIA)

207.   Paragraphs 1-171 are hereby incorporated and realleged.

208.   CO FNU HENRY, CO FNU JACKSON, CO FNU PAIGE and CO FNU GARCIA retaliated against Plaintiff for reporting CO GREEN's sexual assault of Plaintiff.

209.   CO FNU HENRY retaliated against Plaintiff by saying to Plaintiff, "There goes the girl getting a million dollars for getting her tits licked."

210.   CO FNU JACKSON retaliated against Plaintiff on October 18, 2016 when he ignored protocol by pushing aside Plaintiff's privacy curtain, entering Plaintiff's cell while she was naked, stepping into Plaintiff's cell and stating, "Come get it."

211.   CO FNU PAIGE retaliated against Plaintiff by calling her a "liar" and a "faker," regarding both CO GREEN's sexual assault of Plaintiff and Plaintiff's reported illness.

212.   CO FNU GARCIA retaliated against Plaintiff by excessively searching Plaintiff's cell and person and informing Plaintiff that the searches were mandated by "higher-ups" who were afraid Plaintiff was writing an instruction book on exploiting correctional officers.

213.   As a result of the retaliation, Plaintiff suffered severe physical, psychological and emotional distress.

214.   Plaintiff is being treated by the OMH and has recently been prescribed psychiatric medications.

215.   By virtue of their retaliation against Plaintiff for her report of CO GREEN's sexual abuse, CO FNU HENRY, CO FNU JACKSON, CO FNU PAIGE, and CO FNU GARCIA deprived Plaintiff of her right to freedom of speech in violation of her rights under the First Amendment of the United States Constitution.

## EIGHTH CAUSE OF ACTION

### VIOLATION OF N.Y. Penal Law § 195.00, OFFICIAL MISCONDUCT
### (CO FNU WILLIAMS, CO FNU MURPHY, CO FNU EDDY, Sergeant FNU SPIEGHTS, and CO JOHN DOEs #2-3)

216.   Paragraphs 1-171 are hereby incorporated and realleged.

217.   At all relevant times, CO GREEN, CO FNU WILLIAMS, CO FNU MURPHY, CO FNU EDDY, Sergeant FNU SPIEGHTS, and JOHN DOEs #8-9 were correctional officers employed at BHCF.

218.   CO GREEN used his position as a public servant to sexually assault Plaintiff.

219.   CO FNU WILLIAMS prevented Plaintiff from reporting CO GREEN's sexual assault of Plaintiff to PREA CM VELEZ.

220.    Sergeant FNU SPIEGHTS told Plaintiff that Plaintiff must report the incident to her before Plaintiff could report CO GREEN's assault to the PREA hotline or to PREA CM VELEZ.

221.    CO FNU MURPHY asked Plaintiff why CO GREEN had the impression that Plaintiff was willing to have sexual relations with CO GREEN.

222.    CO FNU EDDY prevented Plaintiff from reporting CO FNU JACKSON's violation of DOJ Regulation 28 C.F.R. § 115.15 and DOCCS Directive #4028A/B, "Sexual Abuse Prevention and Staff Intervention – Staff-on-Inmate," when CO FNU JACKSON entered Plaintiff's cell, while Plaintiff was naked, and told her to, "get it."

223.    CO JOHN DOE #2 failed to alert authorities when Plaintiff told CO JOHN DOE #2 about CO FNU JACKSON's actions.

224.    CO JOHN DOE #3 failed to report Plaintiff's complaint against CO FNU JACKSON and ignored her allegations.

225.    CO FNU PAIGE called Plaintiff "a liar" and "a faker."

226.    All correctional officers at BHCF are required by PREA § 115.64 and DOCCS Directive #4028A to report any inmate claims of sexual abuse.

227.    Defendants CO FNU WILLIAMS, CO FNU MURPHY, CO FNU EDDY, Sergeant FNU SPIEGHTS, and JOHN DOEs #8-9 knowingly refrained from facilitating Plaintiff's sexual assault report, or actively prevented it, violating the duty imposed upon them by PREA § 115.64 and DOCCS Directive #4028A and inherent in the nature of their office.

51

## NINTH CAUSE OF ACTION

### VIOLATION OF N.Y. Penal Law § 195.05,
### OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE SECOND DEGREE
### (CO FNU WILLIAMS, CO FNU MURPHY, CO FNU EDDY,
### Sergeant FNU SPIEGHTS, and CO JOHN DOEs #2-3)

228.    Paragraphs 1-171 and 217-228 are hereby incorporated and realleged.

229.    Defendants prevented Plaintiff from reporting CO GREEN's sexual assault by denying her access to PREA representatives, discouraging her from reporting, telling her to "let it go," and calling her a "liar" and a "faker."

230.    Defendants intentionally obstructed, impaired, or perverted the administration of law by preventing or attempting to prevent Plaintiff from reporting CO GREEN's sexual assault of Plaintiff or correctional staff's retaliatory acts against Plaintiff and by failing to keep Plaintiff's reporting confidential.

### Prayer for Relief

WHEREFORE, Plaintiff prays for relief and demands judgment in her favor on each of her claims against defendants as follows:

a.    That a jury find and the Court adjudge and decree that Plaintiff shall recover compensatory damages in the sum of $10,000,000, plus punitive damages in the sum of $10,000,000, against the defendants in punitive damages, plus $1 against the defendants in nominal damages, jointly and severally, together with interest.

b.      That Plaintiff recover the costs of the suit herein, including reasonable

attorneys fees pursuant to 42 U.S.C. § 1988.

**c.**      That Plaintiff be awarded such other and further relief as the Court

shall deem just and proper.

<u>**Jury Demand**</u>

Plaintiff hereby demands a trial by jury on all issues and counts in the

Complaint herein.

Dated:      New York, New York
            March 9, 2017

Respectfully submitted,


By:_____
        Adam D. Perlmutter
        Daniel A. McGuinness
        Victoria N. Medley

PERLMUTTER & MCGUINNESS, P.C.
260 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (212) 679-1990
Fax: (888) 697-0585
Email: dan@pmlawnyc.com

        - and –

Zachary Marguis-Ohnuma

LAW OFFICE OF ZACHARY MARGULIS-OHNUMA
260 Madison Avenue, Suite 1800
New York, New York
Tel: (212) 685-0999
Fax: (212) 685-0922
Email: zach@zmolaw.com
*Attorneys for Plaintiff JANE DOE*

# EXHIBIT A



NEW YORK STATE | Corrections and
Community Supervision

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

August 26, 2015

Terra L. Gearhart-Serna, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York  10022

*Re:  FOIL Log No. 15-1630*

Dear Ms. Gearhart-Serna:

This is in response to your letter requesting information under the New York State Freedom of Information Law.  The following is a response for each item raised:

1. *For each year from 2012 to the present, the number of allegations of staff sexual misconduct alleged by female inmates to have occurred at Albion, Bayview, Beacon, Bedford Hills, or Taconic Correctional Facilities.  By staff sexual misconduct, we refer to all misconduct defined by the Department of Corrections and Community Supervision (DOCCS) in DOCCS Directive #4028A, III. A. - G., including sexual contact, sexual abuse, attempt to commit sexual abuse, sexual threat, staff voyeurism, and inappropriate relationships.*

   The Department does not maintain the requested records in a format that permits practical retrieval; any records that may be responsive, are not maintained in a manner that allows the Department to locate with a reasonable search.

2. *For each year from 2012 to the present, the number of investigations into sexual misconduct opened by the Sex Crimes Unit (SCU) of the Office of Special Investigations (formerly called the Inspector General's Office) arising from Albion, Bayview, Beacon, Bedford Hills, or Taconic Correctional Facilities.*

   **2012**
   84

   **2013**
   68

Ms. Terra L. Gearhart-Serna
August 26, 2015
Page Two

<u>2014</u>

The Department does not maintain the requested statistics in a format that permits practical retrieval; data is still in development and final figures are not available.

3. **For each year from 2012 to present, the number of investigations opened by the SCU into sexual misconduct involving DOCCS staff and arising from Albion, Bayview, Beacon, Bedford Hills, or Taconic Correctional Facilities.**

<u>2012</u>
78

<u>2013</u>
61

<u>2014</u>

The Department does not maintain the requested statistics in a format that permits practical retrieval; data is still in development and final figures are not available.

4. **For each year from 2012 to present, the number of investigations opened into sexual misconduct by SCU involving male DOCCS staff and arising from Albion, Bayview, Beacon, Bedford Hills, or Taconic Correctional Facilities.**

<u>2012</u>
4

<u>2013</u>
2

<u>2014</u>

The Department does not maintain the requested statistics in a format that permits practical retrieval; data is still in development and final figures are not available.

If you do not agree with this decision, you may appeal by contacting the Office of the Counsel, Department of Corrections and Community Supervision, State Campus, Building #2, Albany, New York, 12226, in writing.

Sincerely,

Kimberly Sesselman
Assistant Records Access Officer

# EXHIBIT B



ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

December 2, 2015

Terra L. Gearhart-Serna, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY  10022

Re:  FOIL Log No. 15-1630

Dear Ms. Gearhart-Serna:

Counsel's Office reviewed your letter dated September 1, 2015 and response from the Central Office FOIL Unit ("FOIL Unit") dated June 19, 2015 to your Freedom of Information Law ("FOIL") request.

You seek both clarification of the FOIL Unit's response dated August 26, 2015, specifically, item #4 and lodge an appeal of said response.

You contend that the data provided in item  #s 3 and 4 "would mean that 74 of the 78 SCU investigations that were opened in 2012 involved female staff … and that 59 of 61 complaints in 2013 likewise involved female staff …."

We obtained a copy of your request and the FOIL Unit's response dated August 26, 2015 for review.

It is noted that the FOIL Unit's responses dated June 19, 2015 and August 26, 2015 are the same.

On May 7, 2015, as to item #3, you requested "For each year from 2012 to the present, the number of *investigations opened* by SCU into sexual misconduct involving *DOCCS staff*" at four female facilities. [Emphasis added.]

As to item #4, you requested for the same period, "the number of *investigations opened* into sexual misconduct by SCU involving *male staff*" at the same four female facilities. [Emphasis added.]

On August 26, 2015, the FOIL Unit provided data for 2012 and 2013 and informed you that data for 2014 "is still in development and final figures are not available."

The data obtained by the FOIL Unit shows that in 2012 there were 78 "*investigations opened* by SCU into sexual misconduct involving *DOCCS staff*" at four female facilities and in 2013 there were 61.

The data obtained by the FOIL Unit shows that in 2012, there were 4 *"investigations opened* into sexual misconduct by SCU involving *male staff"* at the same four female facilities and in 2013 there were 2.

Upon further inquiries, we were informed that "only specific data for substantiated cases" was available, not for "all cases opened" and that the word "substantiated" was inadvertently, omitted from the response to item #4.

Therefore, in 2012, of the 78 investigations that were opened, 4 involving male staff were <u>substantiated</u> and in 2013, of the 61 investigations that were opened, 2 involving male staff were <u>substantiated</u>.

We clarified the data in item #4.

Accordingly, your appeal is denied.

Very truly yours,

/s/ Nancy J. Heywood

Nancy J. Heywood
Deputy Counsel

NJH:34:lms
cc:  Records Access Officer, Central Office FOIL Unit
     Committee on Open Government

# EXHIBIT C

| | | TITLE | NO. 2230 |
|---|---|---|---|
| **NEW YORK STATE** | **Corrections and Community Supervision** | **Guidelines for Assignment of Male and Female Correction Officers** | DATE 03/13/2015 |
| | **DIRECTIVE** | | |

| SUPERSEDES DIR# 2230 Dtd. 01/05/2015 | DISTRIBUTION A | PAGES PAGE 1 OF 2 | DATE LAST REVISED |
|---|---|---|---|

| REFERENCES (Include but are not limited to) | APPROVING AUTHORITY |
|---|---|
| | *[signature]* |

## I.  INTRODUCTION

**I.  INTRODUCTION**:  The purpose of this directive is to ensure that the Department's policies regarding the employment of Correction Officers are in full compliance with the Constitution and Statutes of the United States and the State of New York.*

In complying with the law, the Department is mindful of its duty to balance its various obligations under the law including:

A.  The Department's obligation to maintain the security and safety of its facilities and to provide a safe and secure place for its employees, inmates, and visitors to the Department's facilities.

B.  The Department's obligation to ensure to its employees equal rights to employment in any position in its facilities, regardless of gender, consistent with the provisions of this directive.

C.  The Department's obligation to its inmates consistent with the provisions of this directive.  (The inmates' privacy will be protected to the extent the Department is able to do so.  For instance, if the inmate wishes to take a shower in the yard, he or she must be prepared to be viewed by any employee who may be in or near the yard.)

*NOTE:  The decision of the United States Circuit Court of Appeals in Forts v. Ward covers Bedford Hills; therefore, this directive is not applicable to Bedford Hills Correctional Facility.

## II.  POLICY

A.  All Correction Officers will perform the duties that are assigned to them, regardless of gender, provided however that the following assignments will not be made to Correction Officers who are not of the same gender as the inmates:

  1.  Strip frisks or strip searches;

  2.  Obtaining a urine specimen;

  3.  Congregate shower facilities;

  4.  Video taping of strip frisks or strip searches using hand-held video cameras;

  5.  Special Watch (e.g., drug watch); or

  6.  Suicide Watch.

  NOTE:  Cross-gender coverage of an inmate on a Suicide Watch is permissible if exigent circumstances exist.

B.  Where inmates are transported outside of the facility, at least one transporting Correction Officer shall be of the same gender as the inmate(s) being transported.

C.   Whenever two or more Correction Officers are assigned to an outside security detail, at least one must be of the same gender as the inmate.  If only one Correction Officer is assigned to an outside security detail, that Correction Officer shall be of the same gender as the inmate.  If, however, a "roving Correction Officer" is assigned to the hospital and is the same gender as the inmate, the gender of the Correction Officer assigned individual coverage is immaterial.  The gender concern for staff does not apply for outside crew assignments (i.e., community crews).

D.   Cross-gender pat frisks will only be performed in accordance with the procedures set forth in Directive #4910, "Control of & Search for Contraband."

E.   Staff of the opposite gender shall verbally announce their arrival on a housing unit to avoid unnecessarily invading the privacy of inmates of the opposite gender, unless emergency conditions dictate otherwise.  An announcement is required when the gender-supervision on a housing unit changes from exclusively same gender, to mixed or cross-gender supervision.  The announcement(s) by staff must be accomplished in a manner that is easily heard and/or understood by all inmates on the unit.

F.   Except for in-cell shower stalls at "S" blocks, and within the areas designated as special housing units in Upstate and Five Points Correctional Facilities, individual shower stalls will utilize the Corcraft manufactured PVC shower curtain that is designed as breakaway with Velcro straps for attaching, and is available in translucent for use with male inmates and green for use with female inmates.  The bottom 12" of the shower curtains are constructed of clear PVC for viewing the lower legs and feet of the inmate occupying the shower.  The shower curtain must be of sufficient length to cover the bodies of inmates and extend to the floor.

III.   **EMERGENCIES**:  During emergencies, Correction Officers, regardless of gender, may perform any necessary duties including those otherwise prohibited by reason of gender.

| NEW YORK STATE **Corrections and Community Supervision**<br><br>**DIRECTIVE** | TITLE<br><br>**Facility Administrative Coverage & Supervisory Rounds** | NO.<br>4001 |
|---|---|---|
| | | DATE<br>08/26/2015 |

| SUPERSEDES<br>DIR# 4001 Dtd. 04/07/2014 | DISTRIBUTION<br>A | PAGES<br>PAGE 1 OF 5 | DATE LAST REVISED |
|---|---|---|---|

| REFERENCES (Include but are not limited to)<br>Directives #2214, #4004, #4933<br>Correction Law | APPROVING AUTHORITY |
|---|---|

**I.   DESCRIPTION**:  This directive is designed to provide the guidelines for establishing adequate administrative direction within each facility during the absence of the Superintendent.  It also provides direction to ensure that quality daily and weekly rounds are implemented for night shifts, as well as day shifts, of all assigned inmate housing areas and activity areas by Executive Team members, security supervisors, and designated Division Heads.

**II.   DEFINITIONS**

A.   Superintendent:  The chief administrator of a correctional facility as appointed by the Commissioner in accordance with Correction Law, Article 2, Section 18.

B.   Acting Superintendent:  The employee designated to assume the responsibilities of the Superintendent whenever the Superintendent is absent due to illness, vacation, travel on State business, etc., and is not available to take command of the facility.

C.   Officer of the Day (OD):  The employee designated to provide administrative direction on weekends and holidays and during the evening hours and night hours seven days a week.

D.   Executive Team Members:  The Superintendent, First Deputy Superintendent (if applicable), and Deputy Superintendents.  Other staff may be designated by the Superintendent to serve as an Executive Team member in the absence of a Deputy Superintendent or when a Deputy Superintendent's vacancy exists.

E.   Security Supervisors:  Security personnel designated with the rank of Sergeant or above.

F.   Division Heads:  Supervisory personnel that are in charge of a division or specific area of the facility.  The Superintendent may designate specific Division Heads (e.g., Assistant Deputy Superintendent, Captain, Steward, Industry Superintendent, Plant Superintendent, Food Service Administrator, etc.) to participate in weekly rounds and to be present as required during Executive Team and/or Division Head meetings.

**III.   PURPOSE**

A.   To ensure that the facility Executive Team, as well as designated Division Heads, are available to engage in informal contact with staff and inmates, as well as informally observe living and working conditions.

B.   To ensure that quality rounds are completed by security supervisors and that daily written summary reports of the rounds are forwarded through the chain of command to the Deputy Superintendent for Security for appropriate review and action if necessary.

## IV.  ACTING SUPERINTENDENT

A.  Schedule

1.  The First Deputy Superintendent shall be regularly designated as Acting Superintendent.

2.  In those facilities that do not have this position, the Acting Superintendent shall be chosen from the following:

a.  Deputy Superintendent for Security Services*

b.  Deputy Superintendent for Administrative Services*

c.  Deputy Superintendent for Program Services*

d.  Deputy Superintendent for Health Services (if applicable)

e.  Deputy Superintendent for Correctional Mental Health Program (if applicable)

*NOTE:  In facilities which do not have this position, the title shall mean the highest ranking employee with equivalent responsibilities.  In minimum facilities, the Acting Superintendent shall be designated by the Superintendent as conditions warrant.

3.  The name of the Acting Superintendent shall be forwarded by e-mail to the Supervising Superintendent by the facility Superintendent.  The Supervising Superintendent will then forward the name to the Office of the Deputy Commissioner for Correctional Facilities with a copy to the facility's Assistant Commissioner for Correctional Facilities and the Communications Control Center prior to the effective date.

B.  Responsibilities

1.  Superintendents, although not specifically assigned to weekend or holiday duty, are expected to make inspections of the facilities at times other than regular day duty hours.

2.  The Superintendent shall keep the Acting Superintendent informed as to his or her whereabouts.

3.  The Acting Superintendent shall keep the person in charge of the facility informed as to his or her whereabouts, if he or she must be temporarily absent.

## V.  OFFICER OF THE DAY (OD)

A.  Schedule

1.  The OD shall be chosen on a rotating basis and will be chosen from the following:

a.  First Deputy Superintendent (if applicable)

b.  Deputy Superintendent for Security Services*

c.  Deputy Superintendent for Administrative Services*

d.  Deputy Superintendent for Program Services*

*NOTE:  In facilities which do not have this position, the title shall mean the highest ranking employee with equivalent responsibilities.

e.  Deputy Superintendent for Health Services (if applicable)

f.  Deputy Superintendent for Correctional Mental Health Program (if applicable)

g.  Captains

h.   Stewards and Assistant Deputy Superintendents:  When these individuals are assigned OD duty, a Deputy Superintendent or the Superintendent must be readily available to them and within reasonable distance from the facility. Stewards are not peace officers and may not authorize the use of chemical agents, the planned use of physical force (i.e., cell extractions, forcible strip frisk), or the deployment of firearms or chemical agents outside of established post.  In facilities where the Steward or Program Administrator is the highest position in Administrative or Program Services, this section shall not apply, except that the Superintendent shall be contacted for authorization in the event of a planned use of physical force.

i.   In minimum facilities, OD may be rotated among the Superintendent, Deputy Superintendent for Security and/or Captain where applicable, Program Administrator, and Steward.

j.   Other titles may <u>only</u> be added to the OD schedule if they are approved by the Deputy Commissioner for Correctional Facilities.  This approval will only be valid as long as the incumbent who was in the position when the request was made remains in the title.  A new request must be submitted if the title is filled by someone else.

2.   The schedule for each facility OD will be from 4 p.m. Friday to 4 p.m. the following Friday.

3.   Facility Superintendents will choose one of the following options for providing coverage:

a.   OD will be present in the facility during each business day and be "on call" during all non-business hours and days, including Saturdays, Sundays, and holidays.

b.   OD will be present in the facility only on those Saturdays, Sundays, and holidays for which the Superintendent directs on-site presence; when the OD is thus scheduled to be on site on a Saturday, Sunday, or holiday, compensatory time off on a regular business day may be granted as outlined in Directive #2214, "Compensatory Time, Overtime and Recall."

4.   Advance e-mail notification of the name of the employee designated as facility OD shall be forwarded to the Office of the Deputy Commissioner for Correctional Facilities with a copy to the facility's Assistant Commissioner for Correctional Facilities and the Supervising Superintendent.  The Office of the Deputy Commissioner shall provide this information to the Communications Control Center.

When the designated OD is other than a Deputy Superintendent or Captain, the e-mail notification will include the Deputy Superintendent who is available and able to respond to the facility.

5.  As changes are necessitated, the Office of the Deputy Commissioner for Correctional Facilities shall be notified to allow for updating.  An e-mail notification of the name of the employee designated as the facility OD shall be forwarded to the Office of the Deputy Commissioner for Correctional Facilities with a copy to the facility's Assistant Commissioner for Correctional Facilities and the Supervising Superintendent.  The Office of the Deputy Commissioner shall provide this information to the Communications Control Center.

6.  Time spent on assignment as OD shall not be considered as overtime, but rather as a distinctive part of their overall responsibility as an administrator.

7.  In the event of an unexpected absence on the part of the Superintendent or the assigned facility OD, another person selected from the approved list of facility OD eligibles shall be assigned.  An e-mail notification of the name of the employee designated as the facility OD shall be forwarded to the Office of the Deputy Commissioner for Correctional Facilities and the Supervising Superintendent.  The Communication Control Center shall be so informed by e-mail.

B.  <u>Responsibilities</u>

1.  The OD shall keep the Watch Commander informed as to their whereabouts.

2.  The OD shall be "on call" to receive communications from the Watch Commander on matters which may require his or her judgment or return to the facility.

3.  In the event an unusual incident occurs, the Watch Commander shall notify the facility OD as soon as possible.

4.  Depending upon the seriousness of the incident, the facility OD shall:

   a.  Investigate the incident and gather the facts;

   b.  Notify the Superintendent;

   c.  Instruct the Watch Commander to telephone a report of the incident to the Communication Control Center; and

   d.  Ensure that an Unusual Incident Report is prepared in accordance with the provisions of Directive #4004, "Unusual Incident Report."

5.  The facility OD shall be provided with a "communicator" to ensure contact by facility.

6.  The facility OD is expected to tour general areas of the facility and sign the respective logbooks in red ink.  Also, the OD should tour areas during the off-shift (midnights, evenings).

## VI.  ROUNDS

A.  The Superintendent or Acting Superintendent shall establish a schedule whereby the Superintendent or designee, Executive Team members, and designated Division Heads will, when practical, make rounds of the facility's living and activity areas at least weekly to encourage informal contact with staff and inmates, as well as observe living and working conditions.  Each respective logbook will be signed in red ink and shall indicate that their round of the area was unannounced or announced after reviewing and signing the logbook.  Logbook entries should be specific and include details definitive to the respective area (e.g., areas toured, reasons, observations, etc.).  SHU rounds shall be governed by Directive #4933, "Special Housing Units."

NOTE: This should not be interpreted as meaning that every individual is to conduct rounds of the entire facility.  The Superintendent has the discretion to establish a schedule and select staff from the titles mentioned in Section V-A above, so that all areas of the facility will be covered on a weekly basis.

1. Executive Team Members and Designated Division Heads:  Shall complete and forward Form #4001 A, "Weekly Administrative Activity Report," to the Superintendent upon completion of their assigned rounds.  Superintendents should ensure that Executive Team members make rounds in areas not necessarily under their direct responsibility.  If facility policy allows for weekly rounds to be conducted by teams, a single weekly administrative action report must be submitted by the team.

   NOTE:  Executive Team members and designated Division Heads are not expected, nor required, to inspect each cell or dormitory bed, unless directed to do so by the facility Superintendent, but to visit each primary housing unit.

2. Security Supervisors:  Sergeants and Lieutenants (exception when assigned as Watch Commander) who are assigned to an area within the facility (e.g., housing unit, program area) will complete and forward Form #4001 B, "Daily Security Supervisor Report," to their supervisor upon completion of their assigned rounds.  The Daily Security Supervisor Report is to be turned into the Watch Commander for review then forwarded to the Captain's Office and maintained for a minimum of three years.

B. Staff of the opposite gender shall verbally announce their arrival on a housing unit to avoid unnecessarily invading the privacy of inmates of the opposite gender, unless emergency conditions dictate otherwise.  An announcement is required when the gender supervision on a housing unit changes from exclusively same gender, to mixed- or cross-gender supervision.

C. Employees are prohibited from alerting other employees that supervisory rounds are occurring, unless such announcement is related to the legitimate operational functions of the facility.

# EXHIBIT D

| | TITLE | NO. |
|---|---|---|
| **NEW YORK STATE** **Corrections and Community Supervision**<br><br>**REVISION NOTICE** | Facility Administrative Coverage & Supervisory Rounds | 4001 |

| REVISES<br>DIR# 4001 Dtd. 08/26/2015 | | DISTRIBUTION<br>A | PAGES<br>PAGE 1 OF 1 | DATE<br>09/09/2015 |
|---|---|---|---|---|
| REFERENCES (Include but are not limited to)<br>Directives #2214, #4004, #4933<br>Correction Law | | APPROVING AUTHORITY<br><br>*Jose F. Bell* | | |

<div style="border:1px solid black;">

Added new material double underlined.  Delete material lined out.

</div>

☐ Section VI-A-2; revise as indicated:

2. Security Supervisors:  All Sergeants and Lieutenants (exception when assigned as Watch Commander) who are assigned to an area within the facility (e.g., housing unit, program area) will complete and forward Form #4001 B, "Daily Security Supervisor Report," to their supervisor upon completion of their assigned rounds. The completed Daily Security Supervisor Report is to be turned into the Watch Commander for review then forwarded to the Captain's Office and maintained for a minimum of three years.  Watch Commanders are required to complete Form #4001 B and submit directly to their supervisor upon completion of their assigned rounds.

# EXHIBIT E

Page 1

(Wednesday, July 17, 2012.)

(McDonald V Gilbert.)

(Connect

(Frank Ann.

(Jury not present.

THE CLERK:  Bette Jean McDonald versus John E.
Gilbert III, 10-CV-6702Fe.

THE COURT:  Good morning, every one.

We have some housekeeping business to take care and I
wanted to add one other thing to our agenda.

PHEUZ Duque informed me this morning that a juror
toll her this morning that he overheard a conversation --
portions of a conversation I'm not sure - among plaintiff's
counsel.

I don't think it's anything that is disqualifying.

I have not talked to the juror.  I wanted to let you
know about it, but at some point before we start I'm going to
call the juror in and find out what that juror heard.

Let's deal with the other issues we have.  I think
the first one is there was going to be before you rested two
items of evidence which we needed to resolve.

One was a stipulation that you were going to enter
into.

MR. LICATA:  Yes.  We will sign the stipulation when

Page 121

1       THE WITNESS:  Yes.
2       THE COURT:  Objection -FPL next question.
3    Q   (By The Court) Okay.  Next question.
4    Q   At least through 2001 when this case took place you
5    had never substantiated an allegation from an inmate based
6    only on her statement; isn't that correct?
7    A   On any inmate you're talking about or just McDonald?
8    Q   You have -- up and through 2001 you never
9    substantiated an allegation from any inmate based on just that
10   inmate's statement; is that correct?
11   A   I don't -- I don't remember.  I can't answer yes or
12   no.
13   Q   So to substantiate a claim that means that the inmate
14   has to prove the allegation happened; is that correct?
15   A   Absolutely not.
16   Q   Does that mean you have to prove that the allegation
17   happened?
18   A   Absolutely not.
19   Q   Is it the same burden of proof as a criminal
20   conviction?
21   A   What we do is we grab the facts of the case, put 'em
22   all together and depending what the facts are -- there's been
23   times where there's no evidence.  Statements of inmates only -
24   when we present the case to the -- after referring it with the
25   supervisor, we present the case with the State police.  State

Page 122

1    police then takes charge of the case and then makes an arrest
2    based on the interview of the target.
3    Q   But you don't refer every case to the State police;
4    is that correct?
5    A   No.
6    Q   What is the burden of proof that you -- that someone
7    has to meet in order for you to substantiate a claim?
8    A   There's several procedures followed which goes right
9    through Albany.
10   Q   That's not what I'm asking.  What is the PWHURP
11   burden of proof that has to be metaphor a claim to be
12   substantiated?
13   A   I just answered that.
14   Q   Is it beyond a reasonable doubt?
15   A   It goes according to my supervisor.  We refer -- we
16   do what's called a case review.  In a case review they
17   determine whether after discussing the case whether there's
18   enough facts there, evidence or whatever to take it to the
19   next step either labor relations or the State police.
20   Q   Yes, but once you gathered those facts how do you
21   know that you have enough facts to meet a burden of proof?
22   It's because you don't have a burden of proof, isn't it?
23   A   It depends on the case.
24   Q   So, for example, if this was a criminal case there
25   would be a burden of proof of beyond a reasonable doubt.

Page 123

1       Is that -- is that the burden you have to show in
2    order to substantiate a claim?
3    A   Each case is different.
4       There's not -- not all my cases go like that, no.
5    Q   So you're saying within the Department of Corrections
6    Inspector General's Office there's no one standard that has to
7    be established every time to substantiate a case; is that
8    correct?
9    A   Every case is looked at differently because of the
10   allegation of the case, the witnesses of the case, what the
11   witnesses say and then we take it to the next step and then
12   the next step is the supervisory views it and then makes a
13   recommendation whether should go to the State police or not.
14   Q   But there's no one consistent standard under which
15   you evaluate every case, is that true?
16       MR. LICATA:  Your Honor, objection.
17       THE COURT:  No.  I think -- how much proof do you
18   need to take it to the next step?
19       THE WITNESS:  It goes according TPO what the
20   supervisor makes a decision on.
21       THE COURT:  What's the supervisor?  How much proof
22   does the supervisor need?
23       THE WITNESS:  It goes according to what the witnesses
24   say, what the evidence is, if there's any evidence, and then
25   we take it to the next step.  I mean --

Page 124

1       THE COURT:  I think the question is not do you gather
2    evidence, but how much evidence do you need to take it to
3    next step?
4       THE WITNESS:  Goes according to what we - we discuss
5    in our case review.  There's not a clear answer for that.
6    Q   And so on this a more fist, nonexistent standard?
7       MR. LICATA:  Objection.
8    Q   Jury --
9       THE COURT:  She's leading.  It's permissible.  He can
10   answer if he can.
11   Q   Your office -- on this a more fist unclear standard
12   your office determines whether or not something should be
13   referred to the State police?
14   A   According to the evidence.
15   Q   But that is not on any specific standard basis?
16   A   Just like every day criminal law, same way.  If
17   there's going to be --
18   Q   That your testimony this is the same as the burden of
19   proof in a criminal case, beyond a reasonable doubt, is that
20   your testimony?
21   A   I'm not saying that.  I'm saying it's just like we
22   have to present a case to the State police.  Then a D A is
23   going to accept.  State police is going to accept and our
24   office would refer it only if there's enough evidence --
25   sometimes we refer cases to the State police.  They say