UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 02/19/19

YEKATRINA PUSEPA,

               Plaintiff,

    v.

ANTHONY J. ANNUCCI, et al.,

               Defendants.

No. 17-CV-7954 (RA)
[rel. 17-CV-1765 (RA)]

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Yekatrina Pusepa, an inmate at Bedford Hills Correctional Facility ("BHCF"), brings this action pursuant to 42 U.S.C. § 1983 against the following defendants: Anthony J. Annucci, Acting Commissioner of the New York State Department of Corrections and Community Supervision; Jason Effman, Associate Commissioner and PREA Coordinator for New York State Department of Corrections and Community Supervision; A. Rodriguez, Acting Director, Special Housing [] for New York State Department of Corrections and Community Supervision; Sabina Kaplan, Superintendent of BHCF; Ruben Illa, Correction Officer at BHCF; M. Ali, Correction Officer at BHCF; P. Artuz, Correction Officer at BHCF; Michael Daye, Correction Officer at BHCF; FNU Dukes, Correction Officer at BHCF; FNU Moss, Correction Officer at BHCF; Dustin Rubaine, Investigator at New York State Department of Corrections and Community Supervision, Office of Special Investigations; Christopher Nunez, Investigator at New York State Department of Corrections and Community Supervision, Office of Special Investigations; Steven Broomer, Investigator at New York State Attorney General's Office; and

two John Doe Correction Officers at BHCF.[2] While the action alleges an array of constitutional violations stemming from Correction Officer Illa's alleged sexual abuse of Plaintiff, here the Court considers a motion to dismiss Plaintiff's Second Amended Complaint ("SAC") by all defendants *except* for Illa and the two John Doe defendants. Defendants move to dismiss the following seven of Plaintiff's eight causes of action: first, deliberate indifference based on supervisory authority over unconstitutional policies (Defs. Annucci, Effman, and Kaplan); second, deliberate indifference by investigators of Illa's abuse (Defs. Rubaine, Nunez, and Kaplan); third and fourth, denial of, and conspiracy to deny, due process to Plaintiff in her administrative segregation proceedings (Defs. Kaplan, Rodriguez, Artuz, Daye, Nunez, Broomer, and Rubaine); fifth, deliberate indifference by a correction officer in allowing another inmate to attack Plaintiff (Def. Ali); sixth, retaliation by the same correction officer for Plaintiff's cooperation with investigators (Def. Ali); and seventh, retaliation by other correction officers for Plaintiff's cooperation with investigators (Defs. Moss and Dukes). For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND[3]

Plaintiff alleges that between November 2014 and December 2015, Correction Officer ("CO") Illa engaged her in an illicit relationship. SAC at 6. Often Plaintiff and Illa made no attempt to hide their relationship from other correction officers, having long personal conversations in the recreation yard where Illa had no legitimate reason to be. *Id.* ¶ 23. Correction staff frequently observed Plaintiff and Illa engage in these conversations. *Id.* ¶¶ 23–26. At other

---

[2] Plaintiff additionally named CO Speights in her Second Amended Complaint but concedes in her Opposition she has not stated a claim against Speights. Opp. at 31.
[3] These facts are drawn from the Second Amended Complaint and are construed in a light most favorable to Plaintiff. *See Novio v. N.Y. Acad. of Art*, 317 F. Supp. 3d 803, 806 (S.D.N.Y. 2018).

times, the two would meet in certain parts of the recreation yard which were "known to BHCF's staff and inmates to be unobserved and not visible by any camera." *Id.* ¶ 28. Once in those unobserved areas, "Illa would put his arm around Plaintiff's waist and hold her hand." *Id.* ¶ 29. Illa swapped shifts several times to work near Plaintiff. *Id.* ¶¶ 30, 43. In exchange for the relationship, Illa gave Plaintiff privileges, such as allowing her to smoke cigarettes, give tattoos, have other inmates inside her cube, and be out of place. *Id.* ¶ 35. Around April 2015, the relationship became more overtly sexual. First, Illa asked Plaintiff to get in the shower so he could see her naked. *Id.* ¶ 36. Shortly thereafter, Illa and Plaintiff arranged for Illa to come to Plaintiff's cube in private, where two inmates held up a curtain to hide Illa and Plaintiff from view as he touched her vagina for approximately one minute. *Id.* ¶¶ 37–40. Illa also told Plaintiff he wanted to have sex with her, *id.* ¶ 41, and in August 2015 he arranged to be alone with Plaintiff in a storage room to do so, while another inmate stood watch. *Id.* ¶ 44. Illa, however, became frightened and left the storage room before having sexual intercourse with Plaintiff. *Id.*

On December 2, 2015, Plaintiff was told she had a medical appointment by a correction officer in her unit, but she was unaware of any appointment. *Id.* ¶ 45. When she showed up to the clinic, Illa was there. *Id.* ¶ 46. Approximately 20 minutes later, however, several BHCF officers entered the clinic, pulled Plaintiff outside, and conducted a pat-frisk search of her, from which nothing was recovered. *Id.* ¶ 48. A prison sergeant told Plaintiff to "stay away from my officers." *Id.* ¶ 49. After being placed in a cell for three hours and then in a supply closet for seven hours, Plaintiff was placed in a different room and interrogated by Investigator Rubaine. *Id.* ¶¶ 51–53. Rubaine told Plaintiff he knew about her relationship with Illa and would "make her time harder" if she did not answer his questions, remarking "good luck" after she refused. *Id.* ¶¶ 54–56. Immediately thereafter, Plaintiff was escorted to the Special Housing Unit ("SHU"), where she

was confined in isolation with significant restrictions on her privileges. *Id.* ¶ 56. Two days later, Captain Artuz recommended Plaintiff be confined to administrative segregation ("Ad Seg"), alleging that a confidential letter, the finding of a handcuff key on Illa, and results from a confidential investigation supported a finding that Plaintiff had conspired to escape BHCF. *Id.* ¶¶ 59–60, 64. One week later, on December 10, 2015, Captain Daye conducted an Ad Seg hearing, in which Plaintiff pleaded not guilty to the charge of conspiracy to escape. *Id.* ¶ 69. The hearing involved confidential and non-confidential testimony from Artuz and Rubaine, and allowed Plaintiff to pose questions to each witness through Daye, who deemed their answers confidential. *Id.* ¶¶ 70–75. Plaintiff denied the allegations, stating she did not know anyone planning an escape and emphasizing that she had no reason to jeopardize her sentence as her conditional release date was in 2019. *Id.* ¶¶ 78–79. Plaintiff also made several objections to the hearing procedures and to the lack of evidence supporting the allegations. *Id.* ¶¶ 80–81. On January 5, 2016, Daye issued a disposition in favor of the Ad Seg recommendation, which Plaintiff appealed two days later. *Id.* ¶¶ 82, 84. On March 3, 2016, Director Rodriguez affirmed the hearing disposition. *Id.* ¶ 86. On April 13, 2016, Superintendent Kaplan wrote to Plaintiff stating that she had performed a 60-day review of Plaintiff's confinement in Ad Seg, and affirmed the Ad Seg determination. *Id.* ¶ 97.

Beginning in February 2016, while in the SHU, Plaintiff received several visits from different prison officials seeking her cooperation with an investigation. First, Investigator Rubaine visited Plaintiff in the SHU and "told her that if she cooperated with the investigation, he would help her get out of SHU." *Id.* ¶ 85. Plaintiff declined to cooperate. *Id.* Rubaine visited her again a month later and made the same request, telling Plaintiff that he "and others" had known about Illa's inappropriate relationship with Plaintiff since January 2015. *Id.* ¶¶ 88–89. In March, Investigator Nunez visited Plaintiff in the SHU and told her that if she "cooperated and wrote out

a statement he would help her get out of SHU." *Id.* ¶ 92. Plaintiff agreed but did not include details of her sexual contact with Illa. *Id.* ¶ 93. In April, Rubaine visited Plaintiff for a third time in the SHU, seeking "a more detailed and full statement." *Id.* ¶¶ 94–95. He added that although Ad Seg was now "over his head," he would "talk to someone to see what he could do" if she wrote out a more detailed statement. *Id.* ¶ 95. In May, Rubaine returned to visit Plaintiff for a fourth time, where she gave a more detailed statement but did not include details about her sexual contact with Illa. *Id.* ¶¶ 101–02. Around June 10, Rubaine and New York State Investigator Broomer visited Plaintiff in the SHU, where they interviewed her about Illa. *Id.* ¶¶ 104–05. Broomer stated that "if Plaintiff agreed to testify against Illa, Broomer would help her to be transferred out of administrative segregation." *Id.* At that visit, Plaintiff wrote a full statement of approximately 11 handwritten pages, including the details of the sexual contact, and gave it to Broomer and Rubaine. *Id.* ¶¶ 106–07. Around July 5, Rubaine visited Plaintiff in the SHU for the last time, telling her he had spoken to Kaplan and "it was time for her to be released." *Id.* ¶ 108. Plaintiff was then transferred out of Ad Seg, *id.*, and received a letter the same day from Rodriguez that the hearing determination had been reversed. *Id.* ¶ 109.

Plaintiff alleges she suffered substantial psychological and physical harm as a result of her extended period of solitary confinement. *Id.* ¶ 117. While there, Plaintiff was assaulted by another inmate, K.W., who after allegedly overhearing CO Ali and other officers talking openly about Plaintiff's relationship with Illa, taunted Plaintiff about this relationship, and threatened her. *Id.* ¶¶ 118–21. Despite Plaintiff's reporting of this threat and a notation in the correction officers' logbook for Plaintiff to "REC ALONE," CO Ali allowed K.W.—who was in the SHU for violent conduct—into the recreation yard with Plaintiff. *Id.* ¶¶ 124–26. Plaintiff suffered injuries to the face, head, neck, and arm, and was placed in the infirmary for observation. *Id.* ¶¶ 133–34.

In July 2017, approximately one year after Plaintiff had returned to the general prison population, another incident involving BHCF staff also caused her severe emotional distress, psychological harm, and trauma. During a recreation yard event, Correction Officer Moss approached Plaintiff and said to another officer, "This is the bitch messing with [] Illa." *Id.* ¶ 140. Moss subsequently continued to follow Plaintiff around the yard, yelling obscenities in Plaintiff's face. *Id.* ¶ 143. As the event ended, Moss approached Plaintiff, turned off her body camera, approached within inches of Plaintiff's face, and screamed, "I say what I wanna say" and "[w]e can do this anywhere," while repeatedly punching her own hand with a closed fist. *Id.* ¶¶ 145–46. CO Dukes and the two John Doe correction officers then formed a circle around Plaintiff and Moss. *Id.* ¶ 147. Another inmate entered the circle, removed Plaintiff, and escorted her out of the recreation yard and back into the facility. *Id.* ¶ 148.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering a motion to dismiss, "the court is to accept as true all facts alleged in the complaint . . . [and] draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

## DISCUSSION

Defendants move to dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief can be granted. The Court addresses each cause of action in turn, except for the first cause of action against CO Illa, who has not moved to dismiss this action.

## I. Second Cause of Action (Against Annucci, Effman, and Kaplan)

In her second cause of action, Plaintiff alleges that Commissioner Annucci, Associate Commissioner and PREA Coordinator Effman, and BHCF Superintendent Kaplan (the "Supervisory Defendants") were deliberately indifferent to a substantial risk of serious harm to her through their continuation of policies that allowed sexual abuse at BHCF to occur. For the following reasons, Defendants' motion to dismiss this cause of action is denied.

Deliberate indifference claims under the Eighth Amendment include "both an objective and a subjective prong." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Objectively, the deprivation must be "sufficiently serious," meaning the prison conditions posed "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Subjectively, the prison official must act with a "sufficiently culpable state of mind." *Id.*; *Hathaway*, 99 F.3d at 553. Such culpability exists when an official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 847). A plaintiff "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Id.*

Furthermore, under Section 1983, a plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 678. When a prison official is sued, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). In *Colon v. Coughlin*, the Second Circuit identified five ways in

which a plaintiff may establish a supervisory defendant's "personal involvement" in a constitutional violation:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d 865, 873 (2d Cir. 1995). Once a plaintiff properly alleges that a defendant was personally involved in a constitutional deprivation, she "must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). While the Supreme Court's decision in *Iqbal* has raised questions about *Colon*'s viability, the majority of courts in this Circuit have continued to apply the *Colon* factors absent contrary instructions from the Court of Appeals. *See Booker v. Griffin*, No. 16-CV-0072, 2018 WL 1614346, at *11 (S.D.N.Y. Mar. 31, 2018) (collecting cases); *see also Delee v. Hannigan*, 729 F. App'x 25, 31 (2d Cir. 2018). Indeed, this Court has already expressed its view that *Colon* remains good law. *See Phillip v. Schriro*, No. 12-CV-8349 (RA), 2014 WL 4184816, at *4 (S.D.N.Y. Aug. 22, 2014).

There is no dispute in this case that sexual abuse of an inmate violates the Eighth Amendment. *See Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015). Whether Plaintiff considered her sexual contact with CO Illa to be consensual is immaterial; under New York Penal Law §

8

130.05, a person is deemed incapable of consent when she is committed to the care and custody of the state department of correctional services. *See Morris v. Eversley*, 205 F. Supp. 2d 234, 242 (S.D.N.Y. 2002). As Defendants have not contested Plaintiff's allegation that CO Illa engaged in sexual contact with her, they have conceded that Plaintiff has plausibly alleged she suffered sexual abuse at BHCF. The only question, therefore, is whether Plaintiff has alleged personal involvement by the Supervisory Defendants in this constitutional violation. In her opposition to Defendants' motion to dismiss, Plaintiff argues that, under the third and fifth *Colon* factors, the Supervisory Defendants were personally involved in her constitutional deprivation. Opp. at 9.

The third *Colon* factor provides for personal involvement where the defendant "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." 58 F.3d at 873. This requires a plaintiff to adequately allege that the defendant had policymaking responsibility and that, after notice of an unconstitutional practice, the defendant created the improper policy or allowed it to continue, causing the harm. *See Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013).

### A. Responsibility

Failure to rectify a constitutional deprivation is only actionable if the actor "had direct responsibility for monitoring the alleged violation." *Parris*, 947 F. Supp. 2d at 364 ("The Complaint alleges that the defendants were aware of the alleged security flaw, but fails to allege that any of the defendants had 'direct responsibility' for ensuring those posts were manned."). "Dismissal of a section 1983 claim is proper where . . . the plaintiff does no more than allege that [defendant] was in charge of the prison." *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (internal quotation marks omitted).

Plaintiff alleges that, as DOCCS Commissioner, Annucci "was at all relevant times responsible for enacting policies and procedures to protect the safety of inmates incarcerated in DOCCS and ensuring that the policies and practices are enforced in DOCCS facilities." SAC ¶ 152. Effman is identified as the "individual charged with [Prison Rape Elimination Act] responsibilities for DOCCS," making him responsible for "develop[ing], implement[ing], and oversee[ing] agency efforts to comply with PREA standards in all its facilities." *Id.* ¶ 153. Kaplan, as superintendent at BHCF, was "responsible for creating and enforcing policies and practices that ensure the safety of the inmates at BHCF." *Id.* ¶ 154. On a more general level, the Second Amended Complaint alleges that all three Supervisory Defendants were responsible for supervising correction staff and that they were responsible for enacting and enforcing rules governing the behavior of prison staff. *Id.* ¶¶ 175–176, 192.

Plaintiff has plausibly alleged that the Supervisory Defendants bore the responsibility for "creat[ing] . . . or allow[ing] the continuance of" policies and customs that allowed sexual violence at BHCF to occur. *See Colon*, 58 F.3d at 873; *see also Doe v. Kaplan*, No. 16-CV-9870, 2018 WL 1449523, at *6 (S.D.N.Y. Mar. 22, 2018) (finding that Defendant Kaplan and the Deputy Superintendent of BHCF "would have been responsible for deciding how to change Bedford's policies and procedures related to sexual conduct"); *Rossi v. Fishcer*, No. 13-CV-3167, 2015 WL 769551, at *16 (S.D.N.Y. Feb. 24, 2015) (plaintiff plausibly alleged personal involvement by the Commissioner of DOCCS where the Commissioner was responsible for "promulgat[ing] rules, regulations, and policies" under which his rights were burdened); *Aponte v. Fischer*, No. 14-CV-3989, 2018 WL 1136614, at *8 (S.D.N.Y. Feb. 28, 2018) (denying motion to dismiss of Defendant Annucci and other defendants where Plaintiff alleged they had allowed an unconstitutional policy to continue under the third *Colon* factor). This is not a case where a

plaintiff alleges that a high-ranking prison official had a responsibility to respond to and rectify an *individual* complaint by virtue of his place in the prison hierarchy. *See Shepherd v. Sanchez*, 2000 WL 1010829 (S.D.N.Y. 2000), *aff'd in part, vacated in part*, 2001 WL 1398404, 27 Fed. App'x. 31 (2d Cir. 2001) (affirming district court's holding that plaintiff's letters to prison warden were insufficient to establish personal liability).

Rather, Plaintiff's allegation here is premised on the responsibilities within the supervisory officials' exclusive purview—specifically, policymaking responsibilities to safeguard inmates from sexual violence. *See Williams v. Fischer*, No. 08-CV-4612, 2010 WL 3924688, at *3 (E.D.N.Y. Sept. 30, 2010) ("[T]hese defendants [Deputy Commissioner Annucci and others], by virtue of their supervisory and policy making positions at DOCS, may have been the only persons capable of either giving Plaintiff such notice [of an unconstitutional disciplinary sentence] or directing that such notice be given."). If Plaintiff is able to prove that, for example, BHCF's policies allowed the sexual abuse of inmates to occur, Defendants Annucci, Effman, and Kaplan may be liable due to their responsibility for such policies, or for allowing them to continue. *See Gabriel v. Cty. of Herkimer*, 889 F. Supp. 2d 374, 402 (N.D.N.Y. 2012) (allowing a plaintiff's claim to proceed against two "policymaker defendants" who "promulgated and allowed unconstitutional policies and customs to occur and continue, such as the medical officer policy and the under staffing of nurses at the jail"). That Plaintiff alleges the Supervisory Defendants failed to adopt more effective policies suffices for personal involvement, which "can be shown by nonfeasance as well as misfeasance." *Qasem v. Toro*, 737 F. Supp. 2d 147, 151–52 (S.D.N.Y. 2010).

For the foregoing reasons, Plaintiff has plausibly alleged that the Supervisory Defendants had the authority to create or allow the continuance of BHCF policies that led to sexual violence or allowed it to continue.

## B. Notice

The next question under the third *Colon* factor is whether Plaintiff has plausibly alleged that the Supervisory Defendants had "notice of the problem." *Parris*, 947 F. Supp. 2d at 364. Unlike the second, fourth, and fifth *Colon* factors, the third factor does not have an independent intent requirement. *See Marom v. City of New York*, No. 15-CV-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016), *on reconsideration in part*, No. 15-CV-2017, 2016 WL 5900217 (S.D.N.Y. July 29, 2016) (explaining that the second, fourth, and fifth *Colon* factors conflict with causes of action, such as First Amendment retaliation, which contain their own intent requirements, whereas the third factor only requires a plaintiff to show that defendants "created a policy or custom"). Still, courts in this district have consistently held—or at least assumed—that supervisory liability for an unconstitutional policy requires some showing of awareness by the defendants of the policy or custom. *See, e.g., Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *17 (S.D.N.Y. Aug. 2, 2013) ("Plaintiff fails to allege that [the defendant] was aware of such alleged policy and, accordingly, Plaintiff's conclusory allegations are insufficient to demonstrate the personal involvement of [the defendant]."). This comports with the underlying Eighth Amendment violation alleged here: deliberate indifference to a substantial risk of sexual abuse. *See* Opp. at 7; *see Farmer*, 511 U.S. at 828.

The Second Circuit has not articulated precisely what quantum of notice a plaintiff must allege defendants received in order to state a cause of action for allowing a policy to continue, and courts have diverged on this question. *Compare Pagan v. Westchester Cty.*, No. 12-CV-7669,

12

2014 WL 982876, at *22 (S.D.N.Y. Mar. 12, 2014) ("Evidence of notification, via letters or complaints, of an unconstitutional condition is alone not sufficient to indicate that a defendant is personally involved in the unconstitutional conduct.") (citations omitted) *and Rahman v. Fischer*, No. 08-CV-4368, 2010 WL 1063835, at *5 (S.D.N.Y. Mar. 22, 2010) (finding that a superintendent defendant who was allegedly "aware of a large number of assaults in Housing Block B because his 'office' received fifty reports of assaults on staff prior to [the date of the Plaintiff's assault]" was not "personally on notice of a condition that could reasonably lead to an assault of an inmate like [the plaintiff]"), *with Carpenter*, 2017 WL 3887908, at *10 ("[W]hat nudges Plaintiff's allegations over the line from conceivable to plausible is the fact that she has alleged that Defendant Apple was on notice of previous incidents at ACCF involving male corrections officers having inappropriate sexual contact with female detainees.").

The Circuit has, however, addressed an analogous notice issue in the context of municipal liability. In *Cash v. County of Erie*, the Court of Appeals considered a claim by Plaintiff Vikki Cash that Defendant County of Erie, through its then-policymaker Sheriff Patrick Gallivan, had violated her constitutional rights in implementing an ineffective policy that allowed her to be sexually assaulted by a deputy while in pretrial confinement. 654 F.3d 324, 327 (2d Cir. 2011). The appeal turned on whether a reasonable jury could have found that the policymaker had "acted with deliberate indifference to the risk that [the plaintiff] would be sexually assaulted by an unmonitored guard." *Id.* at 335. In ruling for the plaintiff, the Court found that a reasonable jury could have concluded that a *single*, prior report of sexual abuse at the relevant facility would have put the policymaker on notice that "mere proscriptions on sexual contact between guards and prisoners had proved an insufficient deterrent to sexual exploitation." *Id.* at 336. The Court also rejected the defendant's argument that past incidents at other facilities, and the incident

13

underlying the report, bore too little resemblance to the plaintiff's sexual assault to have put the policymaker on notice that this type of violence could occur. "This reasoning," the Court noted, "overlooks the fact that, as a matter of New York state law, any sexual contact between a guard and a prisoner is deemed non-consensual due to the inherent power differential between guards and prisoners." *Id.* at 337.

Though it dealt with a municipal defendant, *Cash* is instructive in this case given that *Monell* liability turned there, as it does here, on the inaction of a policymaking prison official after receiving notice of sexual abuse at a facility. *Carpenter*, 2017 WL 3887908, at *10 (citing *Cash* in a discussion of a supervisory defendant's liability under the third *Colon* factor). Indeed, several courts in this Circuit have found, consistent with *Cash*, that notice of past sexual abuse incidents (and subsequent inaction) can satisfy the third *Colon* factor on motion to dismiss. *See, e.g.*, *Doe v. Kaplan*, No. 16-CV-9870, 2018 WL 1449523, at *6 (S.D.N.Y. Mar. 22, 2018) ("On the facts here, it is plausible that Defendants Kaplan and Snyder would have been notified of the five prior instances of convictions and/or charges of 3rd degree rape of Bedford corrections officers between the 2009 and 2015, and would have been responsible for deciding how to change Bedford's policies and procedures related to sexual conduct."); *Carpenter*, 2017 WL 3887908, at *10 ("[W]hat nudges Plaintiff's allegations over the line from conceivable to plausible is the fact that she has alleged that Defendant Apple was on notice of previous incidents at ACCF involving male corrections officers having inappropriate sexual contact with female detainees."); *cf. Khapesi v. City of New York*, No. 13-CV-4391, 2014 WL 2605342, at *8 (S.D.N.Y. June 10, 2014) ("This is not a situation, for example, where plaintiff contends (in anything but conclusory fashion) that the City had received prior reports of clergy-on-inmate sexual abuse.").

Plaintiff alleges that the Supervisory Defendants were aware of the following incidents and allegations of sexual abuse:

- Seven criminal charges of rape against BHCF staff members, including one conviction and two guilty pleas, since 2009. SAC ¶ 166.

- At least seven pregnancies of DOCCS inmates conceived with DOCCS staff since 2000. *Id.* ¶ 167.

- Over 200 complaints of "staff sexual misconduct" received by the New York Office of Special Investigations ("OSI") each year. *Id.* ¶ 163.

- 78 investigations opened in 2012 by OSI's Sex Crimes Unit into sexual misconduct involving prison staff at all-women's prisons, and 61 such investigations opened in 2013. *Id.* ¶ 165.

Plaintiff also alleges that the Bureau of Justice Statistics at the U.S. Department of Justice periodically releases anonymous surveys on sexual victimization in prisons and jails, and that the last time women prisoners in New York were included in the survey, New York State prisoners allegedly self-reported the highest rates of staff sexual abuse in the nation. *Id.* ¶ 164.

In the Court's view, it is plausible that this evidence of sexual abuse—particularly the allegations regarding BHCF, where Plaintiff is incarcerated—would have put the Supervisory Defendants on notice that existing policies at BHCF were deficient. Plaintiff need not allege that the Supervisory Defendants were aware of CO Illa's specific misconduct while it was happening, as awareness of the *risk* of unconstitutional actions suffices for liability under Section 1983. *See Farmer*, 511 U.S. at 828 ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."). Moreover, Defendants' suggestion that they were not on notice of a risk of this particular type of sexual abuse is unavailing. *See*

Reply at 4. "State law draws no distinction between assaultive and non-assaultive sexual activity in the prison context; it tolerates neither." *Cash*, 654 F.3d at 337; *see* N.Y. Penal Law § 130.05(3)(e)–(f). "Defendants were thus obligated to do the same in carrying out their affirmative duty to protect prisoners from harm." *Cash*, 654 F.3d at 337. Accepting as true the foregoing allegations of frequent sexual abuse at BHCF and other facilities, Plaintiff has plausibly alleged that the Supervisory Defendants were aware of a substantial risk that their policies would allow such abuse to continue.

### C. Causation

Even having pleaded that the Supervisory Defendants were on notice that their policies were deficient in stemming sexual violence, Plaintiff is still required to plausibly allege that the creation or allowance of a specific policy was the proximate cause of her injury. *See Marom*, 2016 WL 916424, at *16 ("[I]f the constitutional deprivation at issue was not a foreseeable consequence of any alleged policy or custom, or the deprivation was caused by some unforeseeable intervening event, plaintiffs have not stated a plausible claim against a supervisory defendant."). Plaintiff has carried this burden at the motion to dismiss stage. In her Second Amended Complaint, Plaintiff identifies several policies and plausibly links them to the alleged constitutional violation by CO Illa, namely that:

- The Supervisory Defendants permitted male staff to guard female inmates alone for prolonged periods of time, where no other staff were within range for visual contact, which meant that "CO Illa routinely was the only officer for the unit, which allowed him ample opportunity to coerce Plaintiff into an improper relationship." SAC ¶ 179–80.
- The Supervisory Defendants granted male correction officers "virtually, unfettered access to private, unmonitored areas[,]" including in areas "where sexual abuse of women

prisoners is easily accomplished," *id.* ¶ 196, which allowed CO Illa to take "advantage of the lack of cameras . . . to further his manipulation of Plaintiff." *Id.* ¶ 201.

- The Supervisory Defendants failed to enact policies to monitor and discipline staff who displayed "warning signs" of sexual abuse, such as transferring shifts and spending disproportionate amounts of time associating with particular inmates, *id.* ¶¶ 182, 184–186, thus permitting CO Illa to transfer shifts and spend frequent time with Plaintiff, *id.* ¶¶ 183, 189, and engage in direct and inappropriate contact with her for months. *Id.* ¶ 187.

- The Supervisory Defendants failed to require unpredictable supervisory rounds, *id.* ¶ 207, resulting in CO Illa knowing that a supervisor would only make rounds twice per shift, thereby "enabl[ing] CO Illa to be confident that he would not be interrupted as he continued to engage in improper conduct." *Id.* ¶ 208–9.

Although any one of these examples alone may be insufficient to state a cause of action, together they plausibly connect the Supervisory Defendants' policies to a reasonably foreseeable consequence, i.e. CO Illa's sexual abuse of Plaintiff.

The Supervisory Defendants portray the Second Amended Complaint as advocating aspirational and unrealistic policy changes rather than pleading proximate cause, at times mischaracterizing what the Complaint alleges. *See* Reply at 6 (stating that "*Cash* did not hold that unmonitored one-on-one interactions between prison employees and inmates per se constitutes deliberate indifference"). Nowhere in Plaintiff's Second Amended Complaint does she suggest that anything short of a flat bar on unmonitored one-on-one interactions constitutes *per se* deliberate indifference by the Supervisory Defendants; instead, she emphasizes that these Defendants allowed prolonged, unmonitored, one-on-one contact between male correction officers and female inmates in areas where sexual abuse was easily accomplished, failed to

implement unpredictable supervisory rounds, and failed to enact policies to monitor and discipline staff who engaged in suspicious behavior with inmates.[4] Far from a simple wish list of policy changes, the Second Amended Complaint alleges how this combination of specific policies was the cause of a reasonably foreseeable constitutional violation. Plaintiff has therefore plausibly alleged that the Supervisory Defendants were liable under the third *Colon* factor. Because the Court concludes that Plaintiff has plausibly alleged liability under the third *Colon* factor, it need not consider the fifth factor.

For the foregoing reasons, Plaintiff has plausibly alleged that Annucci, Effman, and Kaplan were personally involved in violating her Eighth Amendment right to be free from cruel and unusual punishment, and the motion to dismiss the first cause of action is denied.

## II.     Third Cause of Action (Rubaine, Kaplan, and Nunez)

Plaintiff next alleges that Investigators Rubaine and Nunez, together with Superintendent Kaplan, collectively "allowed the illicit relationship [between CO Illa and Plaintiff] to continue in order to gather evidence against CO Illa" in violation of the Eighth Amendment. SAC ¶ 223. "In other words, Plaintiff was used as bait in their investigation." *Id.* ¶ 90.  Plaintiff bases this theory primarily on a conversation she had with Rubaine while in the SHU, in which he purportedly stated that, as early as January 2015, he "and others" had known about the "inappropriate relationship." *Id.* ¶¶ 89–90. For the following reasons, Defendants' motion to dismiss this cause of action is denied as to Rubaine and granted as to Nunez and Kaplan.

---

[4] *See, e.g.*, SAC ¶ 24 (discussing CO Illa's and Plaintiff's "[e]xtended one-on-one personal conversations"); *id.* ¶ 177 (alleging the Supervisory Defendants permitted "male staff" to posts on which they have "ample" opportunity for unmonitored contact with "women prisoners"); *id.* ¶ 208 (noting prolonged periods of time where CO Illa would guard Plaintiff without supervision); *see also* Opp. at 14 ("Annucci, Effman, and Kaplan failed to implement policies that prevented prolonged, unmonitored one-on-one contact between male staff and female inmates.").

As noted above, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Assessing whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The strength of the plaintiff's explanation, however, "need not be 'as compelling as any opposing inference' one might draw from the same factual allegations." *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (citation omitted). "[T]he existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable unless at least one of those competing inferences rises to the level of an 'obvious alternative explanation.'" *Id.* (citing *Twombly*, 550 U.S. at 566).

Plaintiff's allegation relies on two inferences in stating a claim for relief. First, from Investigator Rubaine's alleged statement that he knew about the "inappropriate relationship," Plaintiff asks the Court to infer that he knew of an "imminent risk of sexual abuse." SAC ¶ 224. In light of the broad proscription on sexual contact between correction officers and inmates, *see* N.Y. Penal Law § 130.05(3)(e)–(f), an inference that Rubaine was aware of a specific, imminent risk to Plaintiff based on his knowledge of the inappropriate relationship is reasonable. The second inference is that Rubaine, knowing Plaintiff was at risk, "deliberately allowed CO Illa access to Plaintiff in the hopes that they would catch them engaged in improper activity." SAC ¶ 90. Accepting as true Plaintiff's allegation that Rubaine knew of the "inappropriate relationship," there is no apparent "alternative explanation" for such conduct, let alone an "obvious one." *See Twombly*, 550 U.S. at 567. Plaintiff has therefore plausibly alleged that Investigator Rubaine was deliberately indifferent to an imminent risk of sexual abuse.

As to Investigator Nunez and Superintendent Kaplan, however, Plaintiff seeks one inference too many. Specifically, Plaintiff claims that Nunez and Kaplan are "the others" who knew about the inappropriate relationship, whom Investigator Rubaine mentioned in March 2016. Plaintiff argues that this inference is reasonable because 1) Nunez, as OSI Chief Investigator, was Rubaine's supervisor and "worked in tandem with Rubaine," Opp. at 16; SAC ¶¶ 90–92, and 2) Kaplan, as the superintendent of BHCF, was in "close communication" with Rubaine, as evidenced by Rubaine telling Plaintiff in July 2016 that "he had spoken to Sup't Kaplan and that it was time for her to be released." Opp. at 17; SAC ¶ 108. Plaintiff also asserts that Superintendent Kaplan had prior knowledge of the relationship due to her oversight of Plaintiff's intra-facility transfer in May 2015. The Court must accept as true that Rubaine spoke of "others" like him who had long known of Plaintiff's inappropriate relationship and who inferred that this relationship put Plaintiff at a substantial risk of serious harm, as discussed above. What the Court need not accept, without "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679, is Plaintiff's identification of which prison officials possessed this knowledge. The fact that Investigator Nunez and Superintendent Kaplan worked with Rubaine on Plaintiff's case in 2016 does not support an inference that they knew everything Rubaine knew in 2015. Finally, the speculation that Kaplan's oversight of Plaintiff's May 2015 intra-facility transfer indicates Kaplan's early knowledge of the inappropriate relationship is even more tenuous: there are no allegations in the Second Amended Complaint that this transfer occurred to separate Plaintiff and CO Illa. Memo. at 7. Inferring that Nunez and Kaplan were the "others" with knowledge of the inappropriate relationship would inculpate these two officials based on "mere 'linkage in the prison chain of command.'" *Richardson*, 347 F.3d at 435 (citation omitted). For the foregoing reasons, the motion to dismiss the third cause of action is denied as to Rubaine and granted as to Nunez and Kaplan.

### III. Fourth and Fifth Causes of Action (Kaplan, Rodriguez, Artuz, Daye, Nunez, Broomer, and Rubaine)

Plaintiff's fourth and fifth causes of action relate to actions allegedly taken against her by several supervisory and investigative defendants after her relationship with CO Illa came to light. The fifth cause of action makes two general types of due process allegations against Defendants Kaplan, Rodriguez, Artuz, Daye, Nunez, Broomer, and Rubaine: several of these defendants denied her the procedural due process guaranteed to an inmate when placed in Ad Seg, and others kept her in the SHU solely due to her unwillingness to cooperate in their investigation against CO Illa. The fourth cause of action is a conspiracy claim based on these allegations. Defendants' motion to dismiss the fourth cause of action is granted as to Artuz, Daye, Kaplan, and Rodriguez, and denied as to Nunez, Broomer, and Rubaine; the motion to dismiss the fifth cause of action is granted in its entirety.

### A. The Initial Hearing (Artuz, Rubaine, Daye)

Plaintiff's first allegation is that her initial placement in Ad Seg violated due process. After Plaintiff was detained at the medical clinic and interrogated about her involvement with CO Illa, Captain Artuz recommended that Plaintiff be confined to Ad Seg based on evidence, he claimed, that she was conspiring to escape from BHCF. *Id.* ¶¶ 59–60, 64. Captain Daye then conducted an evidentiary hearing, which involved confidential and non-confidential testimony from Artuz and Rubaine, and issued a disposition in favor of the Ad Seg recommendation. *Id.* ¶¶ 70–75, 82.

In response to the parties' divergent characterizations of the due process standard for Ad Seg hearings, the Court makes two preliminary observations. First, there is a clear distinction in Second Circuit case law between the procedural protections provided in disciplinary segregation hearings and Ad Seg hearings. "Administrative Segregation is not punitive, and thus is governed

21

by *less* restrictive procedural protections than those required under *Wolff* [for disciplinary proceedings]." *Colon v. Annucci*, 344 F. Supp. 3d 612, 637 (S.D.N.Y. 2018) (emphasis added). An Ad Seg hearing, such as the one at issue here, requires "some notice of the charges against [the inmate] and an opportunity to present h[er] views to the prison official charged with deciding whether to transfer [her] to Ad Seg," and once that has occurred, prison officials need only conduct "an informal, nonadversary evidentiary review" of whether confinement is justified. *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)). A disciplinary hearing, by contrast, requires "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). Lesser protections are afforded in Ad Seg hearings because the underlying interests are more pressing: an inmate may be confined to Ad Seg when the inmate "represents a security threat" or in order for the prison to "complet[e] . . . an investigation into misconduct charges." *Hewitt*, 459 U.S. at 476. New York law provides that Ad Seg may be imposed when an inmate "pose[s] a threat to the safety and security of the [prison] facility." N.Y. Comp. Codes R. & Regs. tit. 7, § 301.4(b). "Given the importance of that purpose, Ad Seg is flexible and accords DOCCS officials substantial discretion in deciding whether to impose an Ad Seg term." *Proctor*, 846 F.3d at 601.

Second, despite the significantly reduced procedural protections for an Ad Seg hearing, it is not up for debate, as Defendants seem to suggest, *see* Memo. at 17, whether prison officials may confine an inmate to Ad Seg without any evidence in the record. In *Taylor v. Rodriguez*, the Second Circuit explicitly stated that "some evidence" was "required by federal law" before confining an inmate to "close custody" (Connecticut's Ad Seg equivalent). 238 F.3d 188, 194 (2d

Cir. 2001). Furthermore, this evidence must be "reliable." *Id.* In the context of assessing confidential informant testimony, *Taylor* held that an "independent credibility assessment" is required to ensure the evidence is reliable. *Id.*[5] While certain procedural protections apply only to disciplinary segregation hearings, the requirement of some reliable evidence is not one of them.

Here, Plaintiff received notice of the reasons for the charges against her, an opportunity to be heard before Captain Daye issued his decision, and a final determination supported by reliable evidence. Of most significance, the hearing involved testimony against Plaintiff from witnesses whose credibility the hearing officer was able to assess. In *Taylor*, the Second Circuit noted that confidential testimony had come from informants whose identities the inmate did not know, and who neither the inmate nor the hearing officer questioned on the record. Here, by contrast, Plaintiff herself states that confidential testimony came from two, non-anonymous prison officials whom she had the opportunity to question. SAC ¶¶ 70–72, 74. Second, the hearing involved evidence that CO Illa was found with a handcuff key, *id.* ¶¶ 59, 64, which Defendants note was "unauthorized." Reply at 12. While Plaintiff responds that a handcuff key is merely a "necessary tool for performing the job," finding this key on CO Illa could be linked to an escape conspiracy involving her. It is not the Court's role to weigh in on the persuasiveness of the foregoing evidence. For an initial Ad Seg hearing, this evidence was sufficient to support a determination of confinement.

_____

[5] The *Taylor* decision mentions "discipline" in its discussion of Ad Seg and relies, in part, on *Giakoumelos v. Coughlin*, 88 F.3d 56, 61 (2d Cir. 1996), which dealt with a disciplinary hearing, but the decision explicitly deals with Ad Seg hearings, not disciplinary hearings. "[A] fair reading of the Court of Appeals decision in *Taylor* incorporates into Ad Seg hearings the requirement that a hearing officer independently assess the reliability of a confidential informant." *Davis v. Barrett*, No. 02-CV-0545, 2011 WL 2421109, at *4 (W.D.N.Y. June 13, 2011). *But see Booker v. Griffin*, No. 16-CV-00072, 2018 WL 1614346, at *8 (S.D.N.Y. Mar. 31, 2018) (associating the "reliable evidence" standard exclusively with disciplinary segregation hearings).

Plaintiff has failed to state a claim for relief against Daye, Artuz, and Rubaine for failure to provide due process in connection with the initial Ad Seg placement and hearing.

## B. The 60-Day Review (Kaplan)

Plaintiff's due process claim against Superintendent Kaplan is based on her allegedly deficient, 60-day review of Plaintiff's placement in Ad Seg. In *Hewitt*, the Supreme Court held that once an inmate has been placed in Ad Seg, prison officials must "engage in some sort of periodic review of the confinement" to verify that the inmate "remains a security risk" throughout his term. *Hewitt*, 459 U.S. at 477 n.9. In *Proctor*, the Second Circuit articulated a three-prong test for assessing whether a periodic review is "meaningful": "First, the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified." 846 F.3d at 610. "Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available." *Id.* at 611. "Third and finally, the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term." *Id.*

Plaintiff does not allege that Superintendent Kaplan failed to satisfy these requirements. Instead, she argues first that Kaplan was personally involved in a constitutional violation by affirming an allegedly "unconstitutional disciplinary action," and second that Kaplan "knew that Plaintiff posed no danger to the safety or security of the facility and was not a threat of escape." SAC ¶ 252. The Court need not weigh in on the first question because it has already found that Plaintiff has failed to allege that the initial Ad Seg hearing was unconstitutional. *See Murray v. Arquitt*, No. 10-CV-1440, 2014 WL 4676569, at *12 (N.D.N.Y. Sept. 18, 2014) (refusing to address affirmance liability where the initial hearing passed constitutional muster).

24

On the second point, Plaintiff argues that two factual allegations in the Second Amended Complaint support her claim against Superintendent Kaplan. First, she alleges that Kaplan was "aware[] of the improper relationship for a year prior to acting." Opp. at 21. This claim, however, is based primarily on Rubaine's statement that "others" were aware of the relationship besides him, which, as discussed above, is an unreasonable inference in the Court's view. Second, Rubaine "stat[ed] that he spoke with [Kaplan] to release Plaintiff from ad seg after she cooperated with the investigation," which could demonstrate that Kaplan knew the underlying proceedings were baseless. Opp. at 21. This allegation, however, is chronologically flawed: the conversation between Rubaine and Kaplan did not occur until *after* Kaplan conducted her 60-day review. *See* SAC ¶¶ 97, 104. The existence of that conversation therefore does nothing to show that Kaplan knew Plaintiff's confinement was pretextual when she reviewed Plaintiff's placement in Ad Seg. For these reasons, Plaintiff fails to state a due process claim against Kaplan based on her 60-day Ad Seg review.

Plaintiff's allegations against Acting Director of Special Housing for DOCCS Rodriguez are even thinner. The two factual allegations against Rodriguez are that he "reviewed and affirmed the hearing disposition" and that he informed Plaintiff by letter that the Ad Seg determination had been reversed *Id.* ¶ 109. Plaintiff states that Rodriguez "did not, in fact, conduct any meaningful review of the hearing evidence." *Id.* ¶¶ 86–87. These threadbare allegations fail to state a due process claim against Defendant Rodriguez, and the motion to dismiss is granted as to him.

### C. Pretextual Confinement (Nunez, Broomer, and Rubaine)

Plaintiff next alleges she was denied due process by Investigators Nunez, Broomer, and Rubaine, who kept her confined in the SHU knowing she did not present a security risk, as

evidenced by the *quid pro quo* proposals they made at various times before and during her time in the SHU. Specifically, Plaintiff alleges that "Inv[estigator] Nunez, Inv[estigator] Rubaine, and Inv[estigator] Broomer each communicated to Plaintiff that she would be released from administrative segregation if she would cooperate with the investigation against CO Illa."[6] SAC ¶ 257. Knowing that Plaintiff "did not pose a threat to BHCF" but detaining her anyway, Defendants allegedly "confined Plaintiff in administrative segregation for improper reasons," namely, "as a pretext for coercing information from her." *Id.* ¶¶ 262–63.

The prohibition against pretextual detention as a due process right stems from *Hewitt v. Helms*, where the Supreme Court stated that Ad Seg "may not be used as a pretext for indefinite confinement of an inmate" and thus imposed the requirement of periodic review of an Ad Seg determination, as discussed above. 459 U.S. at 477 n.9. The Second Circuit has read this language in *Hewitt* to "suggest[] that a 'pretextual' administrative confinement might constitute an independent constitutional violation." *Soto v. Walker*, 44 F.3d 169, 173 n.4 (2d Cir. 1995) (quoting *Hewitt*, 459 U.S. at 477 n.9); *see Proctor v. Kelly*, No. 05-CV-0692, 2008 WL 5243925, at *12 (N.D.N.Y. Dec. 16, 2008) ("A 'pretextual' administrative confinement may be raised as a separate constitutional violation.") (quoting *Hewitt*, 459 U.S. at 477 n.9); *Giano v. Kelly*, No. 89-CV-727, 2000 WL 876855, at *17 (W.D.N.Y. May 16, 2000) ("AS [Administrative Segregation] may not be used as a pretext for confining an inmate in SHU when he no longer presents a threat to the security of the facility.").

---

[6] In her Second Amended Complaint, Plaintiff appears to accuse all defendants named in the fifth cause of action of confining her as a pretext for coercing information from her, SAC ¶ 263, but only provides specific allegations as to Nunez, Rubaine, and Broomer. *See* Opp. at 21 (discussing pretextual confinement only as to Nunez, Rubaine and Broomer). The Court therefore limits its consideration of the pretextual confinement allegation to these three defendants.

In support of her claim that pretextual confinement violated her right to due process, Plaintiff describes multiple encounters with Investigators Nunez, Broomer, and Rubaine where they conditioned her release from the SHU on her cooperation with their investigation into CO Illa. The Court finds two of these alleged encounters most relevant. First, just before Plaintiff's placement in the SHU, Investigator Rubaine allegedly told Plaintiff he would "make her time harder" if Plaintiff did not answer his questions about her relationship with CO Illa. SAC ¶¶ 54–56. Second, once Plaintiff had been placed in the SHU, Rubaine and Boomer offered to help transfer her out of Ad Seg if she "agreed to testify against CO Illa." *Id.* ¶ 105. Plaintiff alleges that these investigators made similar proposals numerous times throughout her time in the SHU.[7] Plaintiff also alleges that they were unsatisfied with less detailed statements that did not include the sexual contact between Illa and Plaintiff. *Id.* ¶¶ 93, 95.

Defendants contend that the most reasonable inference to draw from their repeated requests of Plaintiff is that, pursuant to their original investigation into her alleged plan to escape with CO Illa, they continued to deem Plaintiff an escape threat—at least until she divulged all the details of her relationship with him. The Court, however, agrees with Plaintiff that another reasonable—and perhaps more natural—inference is that the officials were building a separate case against Illa, and Plaintiff's testimony was so crucial to this investigation that they detained her in the SHU until she cooperated. This allegation, if true, would constitute an improper use of Ad Seg. Although the decision to keep an inmate in Ad Seg is undoubtedly "flexible," and may be

---

[7] *See* SAC ¶ 85 ("In or about February of 2016, Inv[estigator] Rubaine visited Plaintiff in the SHU, and told her that if she cooperated with the investigation, he would help her get out of SHU. Plaintiff declined to cooperate with the investigation."); *id.* ¶¶ 91–92 ("Later in or about March of 2016, Inv[estigator] Nunez visited Plaintiff in the SHU. At that visit, Inv[estigator] Nunez told Plaintiff that if Plaintiff cooperated and wrote out a statement he would help her get out of SHU."); *id.* ¶¶ 94–95 (Investigator Rubaine, while visiting Plaintiff in the SHU, told her "he would talk to someone to see what he could do, if she wrote out a more detailed statement").

based on "misconduct charges, ongoing tensions in the prison, and any ongoing investigations[,]" *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 477 n.9)), Plaintiff has alleged that her continued confinement was not due to a security threat she posed or because she was being investigated for misconduct, but because Defendants needed her to build a case against CO Illa. This allegation is particularly plausible given that, according to Plaintiff, she was transferred out of Ad Seg only after she finally agreed to provide a full written statement which included the details of her sexual contact with CO Illa. SAC ¶ 108.

Again, this is not the only inference that could be drawn from Defendants' alleged statements to Plaintiff. But at the motion to dismiss stage, Plaintiff's explanation "need not be 'as compelling as any opposing inference' one might draw from the same factual allegations." *New Jersey Carpenters Health Fund*, 709 F.3d at 121 (2d Cir. 2013) (quoting *Tellabs*, 551 U.S. at 324). Here, Plaintiff's allegation is plausible: Investigators Nunez, Broomer, and Rubaine impermissibly kept her in solitary confinement under the pretext that she posed a security risk, for the purpose of making her cooperate with an official investigation into her abuser. *See Hewitt*, 459 U.S. at 477 n.9. The motion to dismiss is therefore denied as to this claim.[8]

### D. Conspiracy Claim (Kaplan, Rodriguez, Artuz, Daye, Nunez, Broomer, and Rubaine)

Plaintiff's fourth cause of action is a conspiracy allegation based on the foregoing conduct alleged in the fifth cause of action. Specifically, Plaintiff alleges a conspiracy by Superintendent Kaplan, Acting Director Rodriguez, Captain Artuz, Captain Daye, and Investigators Nunez, Broomer, and Rubaine to inflict the various constitutional injuries detailed in the fifth cause of

---

[8] To clarify, the Court has dismissed Plaintiff's due process claim against Defendant Rubaine as to his involvement in the initial Ad Seg hearing, but not as to his involvement in Plaintiff's pretextual confinement. Only on this latter theory may Plaintiff proceed against Defendant Rubaine.

action. According to Plaintiff, these defendants collectively detained her in Ad Seg to punish her for her relationship with Illa, and to coerce her into cooperating with their investigation of Illa. SAC ¶ 239–40. To assert a Section 1983 conspiracy claim, a plaintiff must allege: "(1) an agreement between two or more State actors or between a State actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). Even if a plaintiff plausibly alleges a Section 1983 conspiracy claim, under the intracorporate conspiracy doctrine, "officers, agents, and employees of a single corporate entity are legally incapable of conspiring together." *Murphy v. City of Stamford*, 634 F. App'x 804, 805 (2d Cir. 2015) (quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008)) (internal quotation marks omitted). An exception to this doctrine lies where the defendants were "pursuing personal interests wholly separate and apart from the entity." *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 466 (S.D.N.Y. 2012) (citing cases).

The intracorporate conspiracy doctrine bars this claim. Plaintiff argues that the moving defendants pursued "personal" interests, namely their personal interests in punishing her for her relationship with CO Illa. Opp. at 24. While Plaintiff has plausibly alleged that several of these defendants sought to coerce her into cooperating in the investigation of Illa, she alleges no facts in support of a theory that Defendants placed and kept her in Ad Seg to pursue their personal interest in punishing her for the relationship. The only other interest Plaintiff alleges is Defendants' desire to coerce Plaintiff into cooperating in their investigation. This alleged stratagem, as discussed, would violate Plaintiff's due process rights, but it does not involve prison officials "exercis[ing] official duties in unconstitutional ways in order to secure personal benefit." *Alvarez v. City of New York*, No. 11-CV-5464, 2012 WL 6212612, at *3 (S.D.N.Y. Dec. 12, 2012). Plaintiff does not

29

explain Defendants' "individual motivations" in seeking her cooperation in an official investigation. *Dunlop*, 2008 WL 1970002, at *10. The question here is not whether these tactics are unconstitutional (as discussed, Plaintiff has plausibly alleged that they are), but whether they reflected the prison officials' personal interests. Construing the facts in the light most favorable to Plaintiff, Defendants pursued and furthered their employer's interests, not their own. The intracorporate conspiracy doctrine therefore applies, and this cause of action is dismissed.

### IV.    Sixth Cause of Action (Ali)

Plaintiff next alleges an Eighth Amendment violation based on a correction officer deliberately allowing a violent inmate, K.W., into the recreation yard with her, which allowed the inmate to attack her. Defendants' motion to dismiss this cause of action is denied.

"The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers*, 780 F.2d at 209. Failure to protect falls within the umbrella of deliberate indifference under the Eighth Amendment. *Parris*, 947 F. Supp. 2d at 362 ("[T]he failure to protect an inmate only violates the constitution when prison officials act with 'deliberate indifference.'") (citing *Farmer*, 511 U.S. at 834). A plaintiff stating a failure-to-protect claim must plausibly allege that the defendant "knew of and disregarded a particular risk to [the plaintiff's] safety." *Id.* at 363. A plaintiff may allege, for example, that a defendant knew the plaintiff and another inmate were "involved in a prior altercation," that the other inmate "had previously threatened" the plaintiff, or that there was "any other reason for officers at DOC to be on notice that there was a risk of altercation" between the plaintiff and the inmate. *Fernandez v. New York City Dep't of Correction*, No. 08-CV-4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010).

Here, Plaintiff has stated facts supporting a reasonable inference that CO Ali had knowledge of a substantial risk of serious harm posed by another inmate and failed to protect Plaintiff from this harm. First, Plaintiff has plausibly alleged that this was not a surprise attack. *See Zimmerman v. Macomber*, No. 95-CV-0882, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) ("Courts routinely deny deliberate indifference claims based upon surprise attacks."). There was a reported history of antagonism between K.W. and Plaintiff. *See* SAC ¶¶ 121, 125; *cf. Parris*, 947 F. Supp. 2d at 363 ("[T]he Complaint does not allege that the defendants knew of any threats made against the plaintiff or that the plaintiff had been involved in any prior altercations."). K.W. was also "known to be violent at BHCF[,]" "was in SHU for a sanction involving assault on staff[,]" and "had a previous history of assaultive behavior." SAC ¶¶ 123–24. K.W. thus posed a "substantial risk," not an "empty threat." *Zimmerman*, 2001 WL 946383, at *6.

Second, Plaintiff has pleaded facts supporting an inference that CO Ali knew of this risk, and disregarded it in letting K.W. and Plaintiff "rec" together. Although Plaintiff's two principal assertions of Ali's knowledge—that Ali was briefed on the prior incident between K.W. and Plaintiff and that he knew the "REC ALONE" notation was made due to K.W.'s threat to Plaintiff's safety—are based on "information and belief," they are "accompanied by a statement of the facts upon which the belief is founded[,]" as recited above. *Munoz-Nagel v. Guess, Inc.*, No. 12-CV-1312, 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (citation omitted). The Court may reasonably infer that a correction officer responsible for inmate management and safety knew that contravening individualized instructions in a logbook, which arose after a threat reported to his superiors, could result in serious harm to the individual at issue. The motion to dismiss the sixth cause of action is therefore denied.

## V.     Seventh and Eighth Causes of Action (Ali, Moss, Dukes)

The seventh and eighth causes of action in Plaintiff's Second Amended Complaint are retaliation claims against various prison officials who allegedly aimed to punish Plaintiff for her cooperation with OSI investigators against CO Illa. The retaliation claim against CO Ali is based on the conduct described in the previous section. *See* SAC ¶¶ 118, 120–22, 126, 128–29. The retaliation claim against COs Moss and Dukes is based on Moss allegedly threatening Plaintiff due to her cooperation with the OSI investigation against Illa, and Dukes aiding and abetting this conduct. *Id.* ¶¶ 140, 146–47. Defendants' motion to dismiss these actions is granted as to COs Ali and Dukes, but denied as to Moss.

"To state a First Amendment retaliation claim . . . , a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d. Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). While the adverse effect on a speaker "need not be great in order to be actionable," *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003) (citations omitted), the Second Circuit has cautioned that courts should approach prison retaliation claims "with skepticism and particular care," because "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

## A. Retaliation Claim Against CO Ali

The retaliation claim against CO Ali satisfies the first two prongs of the retaliation standard but fails on the third, which requires more detailed allegations of the defendant's state of mind than that required for a deliberate indifference claim. On the first prong, the Court considers Plaintiff's cooperation with OSI's investigation—which involved her reporting CO Illa's sexual abuse—tantamount to filing a grievance. *See Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (treating "cooperation with a state administrative investigation of alleged incidents of inmate abuse at the prison" similarly to filing a grievance, and concluding such cooperation was protected). "It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)). Plaintiff's cooperation with OSI investigators was therefore a constitutionally protected activity.

On the second prong, Plaintiff argues that CO Ali's decision to allow a violent inmate to attack her is an adverse action. In *Dawes v. Walker*, the Court of Appeals considered whether a plaintiff had plausibly alleged an adverse action where a correction officer had allegedly attempted to coerce an inmate into attacking the plaintiff in retaliation for the plaintiff's appeal of a disciplinary order. 239 F.3d at 492. Although it ultimately denied the plaintiff's retaliation claim, the Court accepted the premise that a correction officer who orchestrates rather than directly commits a violent act against an inmate may commit an adverse action for retaliation purposes. *Id.* Moreover, holding a defendant accountable for acts which were the proximate cause of a foreseeable injury is well-established in Second Circuit case law, as discussed above. *See, e.g., Raspardo*, 770 F.3d at 116 (requiring a plaintiff to "establish that the supervisor's actions

33

were the proximate cause of the plaintiff's constitutional deprivation"). For these reasons, Plaintiff has satisfied the second prong of the retaliation standard.

On the third prong, however, Plaintiff has not made allegations "sufficient to support the inference that the speech played a substantial part in the adverse action." *Dawes*, 239 F.3d at 492 (internal quotation marks and citation omitted). As with a deliberate indifference claim, a retaliation claim requires an allegation of the defendant's state of mind. But the standard here is more burdensome. Whereas deliberate indifference claims merely require a showing of awareness with respect to a risk, retaliation claims require a specific purpose—the plaintiff's protected activity must have been a "substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The only allegation Plaintiff makes in support of this causal theory is that Ali told her, "[I] would have cooperated against CO Illa rather than go to the SHU." In the Court's view, this does not support an inference that he was aware Plaintiff was cooperating with OSI and sought to jeopardize her safety as a result. SAC ¶ 118. Plaintiff therefore fails to state a retaliation claim against CO Ali, and Defendants' motion to dismiss the seventh cause of action is granted.

## B. Retaliation Claim Against CO Moss and CO Dukes

Finally, Plaintiff alleges COs Moss and Dukes threatened her in the recreation yard in retaliation for her cooperation with OSI. The principal dispute over this claim is whether Defendants' conduct—cornering Plaintiff in a circle of correction officers and yelling at her—constituted adverse actions likely to chill Plaintiff's speech. On the first prong, Plaintiff's constitutionally protected activity is the same as above: cooperation with OSI investigators against Illa. On the second prong, the parties disagree over whether Moss's words and actions constituted a "threat" that is "specific and direct." *See Salahuddin v. Mead*, No. 95-CV-8581,

2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002) (in order to constitute adverse action, threat must be "specifically directed at plaintiff[] and substantial enough to deter legitimate grievances against prison officers"). According to the Second Amended Complaint, after Moss loudly referred to Plaintiff as "the bitch messing with CO Illa," she "continued to verbally harass Plaintiff, following her around the yard and yelling obscenities into Plaintiff's face." SAC ¶ 143. Once the recreation yard event had concluded, Moss turned off her body camera and approached "within inches of Plaintiff's face" to "scream" at Plaintiff, "I say what I wanna say. We can do this anywhere." *Id.* ¶¶ 145–46. Plaintiff alleges that as Moss made this final remark, she "repeatedly punched her hand with a closed fist." *Id.* ¶ 146. The Court understands "[w]e can do this anywhere" as threatening a physical action or altercation, particularly when combined with pantomime fist-punching. These actions threatened Plaintiff with violence. Furthermore, there is no indication that Moss voluntarily ceased her threats or failed to follow through on them; instead, Plaintiff alleges another inmate intervened and escorted Plaintiff out of the recreation yard. *Id.* ¶ 148. Given her words' "specificity and the context in which they [were] uttered," Moss's threat constituted adverse action. *Hofelich v. Ercole*, No. 06-CV-13697, 2010 WL 184453, at *9 (S.D.N.Y. Jan. 11, 2010). On the third prong, Defendants make no argument. Given that CO Moss allegedly stated "this is the bitch messing with CO Illa" shortly before cornering Plaintiff to threaten her with violence, the Second Amended Complaint plausibly alleges a retaliatory motive for CO Moss's threat, and the third prong is satisfied. Plaintiff has therefore stated a claim for relief against Moss.

The allegations against CO Dukes, by contrast, do not make out a retaliation claim. All Plaintiff alleges is that Dukes and other officers "formed a circle around Plaintiff and CO Moss to confine Plaintiff in close proximity with CO Moss and to witness the fight," and that Dukes was

suspended for inappropriate behavior. SAC ¶¶ 147, 150. Plaintiff has merely alleged that Dukes watched—not participated in—an adverse action of the type that would deter a person of ordinary firmness from speaking out. This does not suffice for a retaliation claim under clearly established law.

For the foregoing reasons, the motion to dismiss the eighth cause of action is denied as to CO Moss and granted as to CO Dukes.

## VI.   Qualified Immunity

Defendants argue that even if Plaintiff can demonstrate a violation of her constitutional rights, they are entitled to qualified immunity. The doctrine of qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (citation omitted). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citation omitted). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004).

The defense of qualified immunity will generally "rest on an evidentiary showing of what the defendant did and why." *Lamzot v. Phillips*, No. 04-CV-6719, 2006 WL 686578, at *8 (S.D.N.Y. Mar. 16, 2006) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003)). The defense, however, is "typically addressed at the summary judgment stage," because it "usually depends on the facts of the case, . . . making dismissal at the pleading stage

36

inappropriate." *Woods v. Goord*, No. 01-CV-3255, 2002 WL 731691, at *10 (S.D.N.Y. Apr. 23, 2002) (citing *King v. Simpson*, 189 F.3d 284, 289 (2d Cir. 1999)). On a 12(b)(6) motion, the defendant "must accept [a] more stringent standard" for raising qualified immunity. *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). "[The] facts supporting the defense must appear on the face of the complaint," *id.* (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998)), and the motion must only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief." *Id.* (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992)).

The Court cannot find Defendants immune from suit at this early stage of litigation. It is—and was, at the time of the alleged conduct—well established that deliberate indifference to a substantial risk of sexual abuse (whether by supervisors or correction officers), denial of due process in Ad Seg proceedings, failure to protect, and retaliation against prisoners for filing grievances with authorities, violates the Constitution. *See Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) (supervisory liability); *Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) (same); *Farmer v. Brennan*, 511 U.S. 825 (1994) (deliberate indifference); *Hewitt v. Helms*, 459 U.S. 460, 476 (1983) (administrative segregation); *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (failure to protect); *Davis v. Goord*, 320 F.3d 346 (2d Cir. 2003) (retaliation). Accepting Plaintiff's factual allegations as true, as the Court must on a motion to dismiss, she has alleged Defendants engaged in conduct that may constitute violations of her constitutional rights. Whether Defendants in fact acted in conformity with their constitutional obligations cannot be decided on the basis of the pleadings. Hence, Defendants are not entitled to qualified immunity at this time.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in

part. The motion is granted as to: Defendants Nunez and Kaplan in the third cause of action; all Defendants in the fourth cause of action; Defendants Artuz, Daye, Kaplan, and Rodriguez in the fifth cause of action; Defendant Ali in the seventh cause of action; and Defendant Dukes in the eighth cause of action. The motion is denied as to: all Defendants in the second cause of action; Defendant Rubaine in the third cause of action; Defendants Rubaine, Nunez, and Broomer in the fifth cause of action; Defendant Ali in the sixth cause of action; and Defendant Moss in the eighth cause of action.

The Clerk of Court is respectfully directed to remove Defendants P. Artuz, Daye, Speights, A. Rodriguez, and Dukes from the caption of this case. The Clerk of Court is further directed to terminate the motion pending at docket number 59.

SO ORDERED.

Dated:    February 19, 2019
          New York, New York

                                          Ronnie Abrams
                                          United States District Judge